**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Petitioner,**

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent.**

**Harold Spencer, Intervenor.**

No. 02–AA–707.

District of Columbia Court of Appeals.

Argued May 22, 2003.
Decided June 26, 2003.

Gerard J. Stief, Associate General Counsel, with whom Cheryl Burke, General Counsel, Robert J. Kniaz, Deputy General Counsel, and Donna J. Henderson, Assistant General Counsel, were on the brief, for petitioner.

Mark L. Schaffer, Washington, DC, for intervenor.

Arabella W. Teal, Interim Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, filed a statement in lieu of brief, for respondent.

Before WAGNER, Chief Judge, and SCHWELB and REID, Associate Judges.

REID, Associate Judge:

Petitioner Washington Metropolitan Area Transit Authority ("WMATA") filed a petition for review of a decision of the Director of the Department of Employment Services ("the Director") affirming a compensation order in favor of intervenor Harold Spencer ("Mr. Spencer"). We affirm the decision of the Director. We hold that the Director and the Administrative Law Judge ("ALJ") applied the correct legal standard governing the presumption of compensability; and that the employee satisfied his initial burden regarding the presumption of compensability. We also hold that the employer failed to present substantial evidence to rebut that presumption; and that based upon the record in this case, no additional medical evidence was necessary to refute the sworn testimony of the employer's expert. The employ-

ee presented extensive medical reports from his treating physician and other documentary evidence to satisfy his burden of proof, and the opinion of the employer's expert was based upon a flawed factual assumption. Finally, we conclude that the record in this case contained substantial evidence to support the Director's and the ALJ's findings and determinations.

## FACTUAL SUMMARY

According to the factual findings of the ALJ in this case, on May 26, 2000, Mr. Spencer, an elevator and escalator technician for WMATA, had completed an inspection of an elevator shaft at the Van Ness station, where he found "eight inches to a foot of water which [he] believed contained oil," and was in the process of climbing a ladder from the shaft when he slipped and fell, striking his back on a shut off valve and injuring his knees. After informing his supervisor of his fall, he sought medical treatment from the George Washington University Hospital. There, he filled out an incident report form. He stated that he had "injured his right and left knee as well as his right ankle and back in the incident." Although Mr. Spencer had a prior "circulatory problem with his right leg[, it] was corrected by . . . a vascular surgeon." Mr. Spencer was "not treated for any vascular problem with his left leg."

Mr. Spencer was unable to work from May 27, 2000, through October 10, 2000. When he returned to work on October 11, 2000, "[h]e began to feel a sharp pain in his left knee and thereafter his left knee would buckle when he walked." When he ascended stairs, he noticed a clicking sound in his left knee. So, he again sought medical diagnosis and treatment on February 13, 2001 from the same doctor who had treated him after his accident on May 26, 2000, Dr. Craig Faulks.

Dr. Faulks advised Mr. Spencer that he should get an MRI and that he might need an arthroscopic procedure. The MRI "revealed chondral damage to the medial femoral condyle." WMATA did not authorize the arthroscopic procedure. Nevertheless, Mr. Spencer proceeded with the arthroscopic surgery on August 3, 2001, by using his own insurance. During the surgery, Dr. Faulks found "a small radial tear of the medial meniscus," as well as "a complex degenerative tear of the meniscus." He repaired the radial tear, debrided the complex degenerative tear, and prescribed six weeks of therapy.

Mr. Spencer filed a workers' compensation claim for temporary total disability benefits from April 12, 2001 to April 21, 2001, from May 19, 2001 to the time of filing, and continuing. The ALJ found in favor of Mr. Spencer's claim, and awarded him temporary total disability payments for the specified time period, as well as "all reasonably related medical expenses." WMATA filed a petition for review with the Director, and the Director affirmed the compensation order.

## ANALYSIS

WMATA contends that "the Director's [d]ecision is legally flawed and must be reversed." It is flawed in the first instance, WMATA argues, because of "[t]he failure of the Director to consider the evidence submitted by [WMATA] to rebut the presumption [of compensability]." That testimony came from the deposition of WMATA's expert, Dr. James Callan. WMATA claims that the Director's decision is also flawed "because [Mr. Spencer] submitted no expert medical evidence to prove by a preponderance of the evidence that his left knee condition was causally related to the work injury." Therefore, WMATA argues that the Director's deci-

sion is not supported by substantial record evidence.

Mr. Spencer supports the conclusions of the ALJ and the Director that, in essence, Dr. Callan's testimony "was manifestly insufficient to rebut the presumption of compensability." In addition, Mr. Spencer asserts that there is substantial record evidence to support the determination of the ALJ, and the affirmation of the Director, that his left knee injury was causally related to his fall on May 26, 2000. That evidence includes his testimony which the ALJ credited, the medical reports of Dr. Faulks and other documents, and the cross-examination responses of Dr. Callan. In response to WMATA's argument that expert testimony was required to rebut that of Dr. Callan, Mr. Spencer emphasizes that his is a workers' compensation claim, and that a claimant is not required to meet the standards imposed in a negligence case.

 Generally, "[w]e review the Director's legal rulings *de novo,* but otherwise defer to the Director's determination so long as it rationally flows from the facts and is supported by substantial evidence on the record." *Safeway Stores v. District of Columbia Dep't of Employment Servs.,* 806 A.2d 1214, 1219 (D.C.2002) (citations omitted). Specifically, in a case of this type, where the presumption of compensability has been challenged by the employer, our approach has been summarized partially in *Brown v. District of Columbia Dep't of Employment Servs.,* 700 A.2d 787 (D.C.1997):

In the District of Columbia, there is a presumption of compensability under the [Workers' Compensation] Act. D.C.Code § 36–321(1) [now codified at § 32–1521(1) (2001) ]; *Ferreira [v. District of Columbia Dep't of Employment Servs.,* 531 A.2d 651, 655 (D.C.1987) ]. Its purpose is to advance the humanitar-ian goal of the statute to provide compensation to employees for work-related disabilities reasonably expeditiously, even in arguable cases, *Id.* at 654–55 (citations omitted). To come within the presumption, a claimant must make an initial showing of some evidence of "a death or disability and a work-related event, activity, or requirement which has the *potential* of resulting in or contributing to the death or disability." *Id.* (citation omitted). Once that showing has been made, "[t]he presumption then operates to establish a causal connection between the disability and the work-related event, activity, or requirement." *Id.* (footnote and citation omitted). The claimant must provide some evidence that the disability is connected with the employment before the burden of production is shifted to the employer. *Id.* at n. 5. Once shifted, the employer has the burden of producing "substantial evidence" demonstrating that the disability did not arise out of and in the course of employment. *Id.* at 655.

*Id.* at 791 (emphasis in original). We have defined " 'substantial evidence' as more than a mere scintilla." *Washington Hosp. Ctr. (Anderson) v. District of Columbia Dep't of Employment Servs.,* 746 A.2d 278, 281 (D.C.2000) (quoting *Stewart v. District of Columbia Dep't of Employment Servs.,* 606 A.2d 1350, 1352 (D.C.1992)). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "specific and comprehensive enough to sever the potential connection between the disability and the work-related event." *Safeway Stores, supra,* 806 A.2d at 1219 (citations and internal quotation marks omitted). The employer is required, however, only to present " 'substantial evidence' to rebut the statutory presumption, not to disprove causality with an absolute certainty." *Id.*

at 1220 (quoting *Washington Hosp. Ctr. (Callier) v. District of Columbia Dep't of Employment Servs.*, 744 A.2d 992, 1000 (D.C.2000)).

If the employer is "able to rebut the presumption [of compensability through the presentation of substantial evidence, then the claimant must] prove by a preponderance of the evidence that [the] . . . injury was caused by [his] job requirements. . . ." *Washington Hosp. Ctr. (Anderson), supra,* 746 A.2d at 281 (citing *Stewart, supra,* 606 A.2d at 1352–53). And, the agency's task then is to "weigh[ ] the evidence presented at the hearing to determine if a causal relationship existed between [the claimant's] job requirements and [his] injury." *Id.* at 282.

"[I]n assessing the weight of competing medical testimony in worker compensation cases, attending physicians are ordinarily preferred as witnesses to those doctors who have been retained to examine the claimant solely for purposes of litigation." *Stewart v. District of Columbia Dep't of Employment Servs.*, 606 A.2d 1350, 1353 (D.C.1992) (citation omitted). While *more* weight *may* be *given to* the views of a non-treating physician, "there would be little force to the preference in favor of a treating doctor's opinion if the agency could ignore that opinion without explanation." *Canlas v. District of Columbia Dep't of Employment Servs.*, 723 A.2d 1210, 1212 (D.C.1999). Thus, the agency must explain any decision to credit a non-treating physician's opinion over that of the treating physician. *Id.*

Contrary to WMATA's argument, our review satisfies us that neither the Director's decision nor that of the ALJ is "legally flawed." We have stated previously "that a compensation order [need not] contain certain magic words in order to demonstrate that the examiner [or the Director] followed the statutory procedures." *Washington Hosp. Ctr. (Callier), supra,* 744 A.2d at 997. "The relevant question is not whether the examiner [or the Director] said [she or he] applied the [procedure governing] the statutory presumption, but whether in fact, [she or] he properly did so." *Id.*

Here, the Director recognized that the first step in the analysis of Mr. Spencer's case was to ascertain whether he "ma[d]e an initial showing of some evidence of a . . . disability and work-related event . . . which has the *potential* of resulting in or contributing to the . . . disability." *Brown, supra,* 700 A.2d at 791 (internal quotation marks and citation omitted) (emphasis in original). In light of Mr. Spencer's testimony at his compensation hearing, which was credited by the ALJ; his completion of the "Employee on the Job Injury and Occupational Illness Report" form on May 26, 2000, while he was still in the hospital; the medical reports of Dr. Faulks, the treating physician whose opinion is "ordinarily preferred" over that of a non-treating doctor, *see Stewart, supra,* 606 A.2d at 1353 (citation omitted); and other documentary evidence presented by Mr. Spencer, the Director correctly affirmed the ALJ's conclusion that "the evidence submitted by the Claimant was sufficient to invoke the presumption of compensability that his disability is causally related to the injury."

Mr. Spencer established that he slipped and fell off of a ladder[1] while he was performing monthly maintenance work on the platform elevator at the Van Ness station, he "landed on the shut-off valve"

---

1. Mr. Spencer explained that "[t]here [was] a makeshift ladder . . . mounted on the wall. . . . [I]t's not a true ladder, it's made of more or less scrap metal parts, like a piece of angle iron."

which "has a straight handle." His back "hit [the shut-off valve] so hard [that] it bent the handle on it...." When asked "[w]hat was hurting" when he went to the George Washington University Hospital, he testified: "Well, at that point the knot on the head was hurting pretty good, and the back pain was like somebody punched me hard in the back. And my knees were weak...." In the section of the "Employee on the Job Injury" form that Mr. Spencer filled out on May 26, 2000, and which asks for "part(s) of the body injured," Mr. Spencer checked: head, upper back, knees and right ankle. The emergency room record for Mr. Spencer's May 26, 2000, visit to the hospital contains the notation, "knee pain." And, beginning on June 26, 2000, the medical reports of Dr. Faulks, Mr. Spencer's treating physician, show that he suffered injuries to his knees when he fell on May 26, 2000, and that he was unable to work for a period of time. Consequently, there was substantial evidence in the record to support the Director's affirmation of the ALJ's finding that Mr. Spencer met his burden of an initial showing of some evidence of a work-related injury with the potential of resulting in a disability. In short, Mr. Spencer successfully invoked the presumption of compensability, and consequently, "[t]he presumption then operate[d] to establish a causal connection between the disability and the work-related event...." *Brown, supra,* 700 A.2d at 791 (citation omitted). In addition, his evidence established that the disability relating to his knees that prevented him from engaging in his normal work at WMATA was "connected with [his] employment." *Id.*[2]

■ After Mr. Spencer successfully met his initial burden, the "burden of production [then] shifted to the employer," and

WMATA was required to present " 'substantial evidence' demonstrating that the disability did not arise out of and in the course of [Mr. Spencer's] employment." *Id.* The Director obviously considered this second step in the process because he focused on Dr. Callan's testimony on behalf of WMATA. Dr. Callan "stated that his examination of [Mr. Spencer] revealed arthritis of the knee(s) and further [asserted] that there was no indication of bruising or swelling in the hospital records from the date of injury which would substantiate [Mr. Spencer's] position that the knee injury was the result of the fall in the elevator shaft." The Director also expressed his awareness of WMATA's assertions that the ALJ "failed to consider all evidence [that it] presented, applied the wrong standard for overcoming the causal presumption, and [that] therefore, the conclusion of compensability is not supported by substantial evidence in the record."

■ Important to reiterate is a longstanding principle in this jurisdiction: "It is well-established ... that a disability resulting from the aggravation of a pre-existing condition is compensable under the [Workers' Compensation Act]." *Washington Hosp. Ctr. (Callier), supra,* 744 A.2d at 997 (citation omitted). Moreover, "it is immaterial that other factors unrelated to the employee's work duties, may have contributed in some way to the aggravation of [the employee's] condition. [C]ompensation is warranted so long as [the employee's] disability arose, in part, from [his] work-related activities." *Id.* Thus, even though Mr. Spencer may have had an arthritic condition in his knee(s), aggravation of that condition as a result of his May 26, 2000, work-related fall and injury would be compensable.

2. WMATA does not contest the fact that Mr. Spencer presented sufficient evidence to trig-

ger the presumption of compensability in the first step of the analysis.

The Director implicitly recognized that the ALJ applied the correct legal standard with respect to WMATA's burden of production. As the ALJ declared: "[The][e]mployer must ... submit substantial evidence both specific and comprehensive on the question of a causal relationship between the disability alleged and the injury." This is consistent with what we said in *Safeway Stores, supra,* 806 A.2d at 1219 (the employer's evidence must be "specific and comprehensive enough to sever the potential connection between the disability and the work-related event."). The ALJ and the Director further understood that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* This understanding is reflected in the ALJ's critical comment that Dr. Callan did not review pertinent medical reports of the treating physician, "provided no reasoning for his opinion that [Mr. Spencer] did not injure his left knee on May 26, 2000"; and that his "vague opinion as to causality, rendered admittedly without full review of claimant's medical records, is not specific or comprehensive enough to rebut the presumption." In ad-

dition, the Director rejected a basic premise of Dr. Callan's opinion, "that the lack of documentation" showing Mr. Spencer's "immediate complaints about [his] knee, is obvious evidence of the fact that there was no injury to that are a as a result of the fall at work."

Our review of Dr. Callan's testimony convinces us that the Director correctly concluded that WMATA presented insufficient evidence to rebut the presumption of compensability; and that its evidence was neither "specific and comprehensive enough to sever the connection between [Mr. Spencer's] disability and [his] work-related [fall]," *Safeway Stores, supra,* 806 A.2d at 1219, nor could it be considered "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.* Dr. Callan's deposition testimony shows that he examined Mr. Spencer only once, on August 2000. He stated that, at that time, he had reviewed only Mr. Spencer's emergency room records from George Washington University Hospital, and "some office records from Dr. Faulks dated June 5th, June 15th [2000] and May 31st I believe."[3] When

---

3. Dr. Callan admitted that not until the day of his deposition testimony did he see Dr. Faulks' medical reports dated June 26, 2000, indicating that Mr. Spencer "injured his knees when he fell in the elevator shaft at work on 5–26–00"; July 10, 2000, showing that Mr. Spencer suffered from "continued pain in his knees, especially the left"; and July 24, 2000, specifying "continued bilateral knee pain especially with stair climbing." Apparently, he also did not have these and other reports prepared by Dr. Faulks when he reviewed the results of Mr. Spencer's March 21, 2001, MRI procedure, showing in part a "2cm area of marrow edema in the femoral condyle which may represent bone contusion."

Significantly also, prior to his deposition testimony on September 10, 2001, Dr. Callan never saw Dr. Faulks' October 26, 2000, report stating, in part, that Mr. Spencer "injured his back and knees when he fell in an

elevator shaft. His major complaint now is of left knee pain. His knees will give way." Nor had he seen the February 13, 2001, report of Dr. Faulks indicating that "Mr. Spencer returns with continued giving way of the left knee. It has been more severe in the last few weeks."

There were additional reports that Dr. Callan did not see prior to his deposition. These included reports leading ultimately to Dr. Faulks' decision to proceed with surgery: April 5, 2001 ("[Mr. Spencer] continues to have catching pain in the knee that bothers him at least weekly when the knee will lock and make it difficult for him to walk"); April 12, 2001 ("Mr. Spencer returns with debilitating pain in the left knee. He gets a catching pain along the medial side."); May 16, 2001 ("Mr. Spencer['s] ... left knee pain .... has been worse recently and it clicks and causes pain going up and down stairs."); June 18, 2001 ("It is my IMPRESSION that Mr.

asked, "[w]hat questions were you asked to give your opinion on," Dr. Callan initially did not mention "causality" with respect to Mr. Spencer's knee injuries. He responded:

> His diagnosis and prognosis; whether or not he was capable of returning to full duty or a light duty job; if he had any restrictions in his work and for how long; was his current treatment plan medically necessary and appropriate; did he require further medical treatment as a result of his accident and what kind and for how long; had he reached maximum medical improvement.

Moreover, Dr. Callan testified that Mr. Spencer "stated that he was having pain in the knees with going up and down steps and that his back felt good at that time and he was having no problems." The doctor acknowledged that the emergency room records of May 26, 2000, the day of Mr. Spencer's injury, specified "motor strength in the lower extremities was slightly inhibited by known knee pain," and that Mr. Spencer "had a contusion of his back and chronic knee pain." He attributed the pain and the "grinding kind of sensation" to "normal wear and tear arthritis of his knees." He expressed the opinion that Mr. Spencer's

> symptoms in his knees were not in any way causally related to [his injury on May 26, 2000] based primarily on the fact that there was no complaint of the knees at the time that he was examined early on, either by the emergency room or Dr. Faulks, except for this chronic knee pain, and there was no evidence of any knee injury early on and the fact

that it's symmetrical and ... is consistent with the normal degenerative arthritis of the knees.

In rendering this opinion, Dr. Callan clearly did not take into account the May 26, 2000, Employee on the Job Injury report form completed by Mr. Spencer showing that he complained of pain in his knees. Nor had he reviewed medical reports concerning Mr. Spencer's vascular problem with his right leg, not his left leg. In fact, he had not seen the majority of Dr. Faulks' medical reports prior to his deposition, and these reports extended from June 26, 2000, to August 16, 2001. They also showed persistent left knee pain, "giving way of the left knee" or "locking" of that knee, as well as clicking and "catching pain in the left knee especially with stair climbing." Those reports undoubtedly would have been helpful as Dr. Callan opined on Mr. Spencer's March 21, 2001 MRI results showing a possible "bone contusion." In fact, despite his insistence that Mr. Spencer's knee pain was attributable to degenerative arthritis, he acknowledged that in a person with arthritis "[t]he articular cartilage softens and thins ... [and] become[s] more susceptible to tearing." He also admitted that if Mr. Spencer "twisted his left knee during the course of his injury, ... [it could] cause further wear and tear" on the knee. Moreover, he agreed that one of the indicators or "sources" of a knee "giving away" is "a meniscal tear," one of the conditions Dr. Faulks found during his surgery on Mr. Spencer's left knee.

When asked what his recommendation would be if someone came to him with

---

Spencer sustained an injury to his left knee from a fall in an elevator shaft while on the job 5–26–00. This likely created the chondral injury to the femoral condyle as well as the injury to the tibial plateau. I believe he would benefit from arthroscopic surgery to treat this damage from the on the job injury

and we are awaiting approval to proceed."); July 23, 2001 ("Mr. Spencer continues to get catching pain in the left knee especially with stair climbing. It keeps him from performing his job."). After reading the reports that he had not seen previously, however, Dr. Callan adhered to his original opinion.

complaints mirroring those of Mr. Spencer—that is, "several months of complaints of the leg giving away, of catching pain, of locking, clicking, joint line tenderness....," Dr. Callan responded that he "might recommend a diagnostic arthroscopy," and although he would not "expect necessarily to find anything else," he "would look for other things, such as a torn meniscus...." In short, he might follow the recommendation of Dr. Faulks and look for the torn meniscus, as Dr. Faulks did. He also conceded that "a small radial tear of the medial meniscus and a degenerative tear of the lateral meniscus .... don't always show up in the MRI...." Yet, on redirect examination by counsel for WMATA, and after reviewing Dr. Faulks' report of Mr. Spencer's surgery showing the finding of the small radial tear of the meniscus and the complex degenerative tear of the lateral portion of the meniscus, Dr. Callan stated that the post-operative report "[did] not change [his] opinion at all." He explained:

> [T]hat's based primarily on the lack of initial complaints of an acute trauma to the knees, especially the left knee, and the lack of any physical examination early on with regards to the left knee that indicated any trauma to it and the fact that these findings are consistent with degenerative changes also.

Based upon this review of the record, we cannot agree with WMATA that Dr. Callan's testimony satisfied the requirement that "the employer ... produce[ ] 'substantial evidence' demonstrating that the disability did not arise out of and in the course of employment." *Brown, supra,* 700 A.2d at 791. Significantly, both the Director and the ALJ found Dr. Callan's testimony insufficient because he had not read and considered most of the medical reports prepared by Dr. Faulks, Mr. Spencer's treating physician. We conclude that Dr. Callan's testimony did not rise to the level of "substantial evidence" and did not adequately rebut the presumption of compensability (1) in the absence of his consideration of most of the treating physician's medical reports extending over more than a year; (2) in light of his insistence that there were no initial complaints of left knee pain even though Mr. Spencer's report of his injury on May 26, 2000, identified such pain, and the May 26, 2000, emergency room records of the George Washington University Hospital stated "knee pain"; and (3) given his admission that an arthritic knee is susceptible to tearing and aggravation. Under the circumstances, Dr. Callan's testimony does not amount to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"; and is not "specific and comprehensive enough to sever the potential connection between [Mr. Spencer's] disability and [his] work-related [fall on May 26, 2000]." *Safeway Stores, supra,* 806 A.2d at 1219 (internal quotation marks and citations omitted).[4]

---

4. At oral argument, counsel for WMATA contended that in determining whether the presumption of compensability has been rebutted, the agency may not consider the credibility of the employer's physician or the believability of his or her testimony. Counsel cited *Safeway Stores, Inc., supra,* and *Washington Hosp. Ctr. (Anderson), supra.* We have considered these decisions, and we conclude that neither stands for such a proposition. Counsel also cites *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), an employment discrimination case brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* In that case, the Court stated that after the plaintiff has established a prima facie case of discrimination, the employer, in order to rebut that prima facie case, "must set forth, through the production of admissible evidence, reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of

■ Furthermore, we reject WMATA's argument, raised for the first time in this court, that the ALJ and the Director were required to move to the third step of the presumption of compensability analysis and place the burden on Mr. Spencer to "prove by a preponderance of the evidence that [his] ... injury was caused by [his] job requirements...."[5] *Washington Hosp. Ctr. (Anderson), supra,* 746 A.2d at 281 (citation omitted). WMATA contends that the Director (and the ALJ) erred by not requiring Mr. Spencer to present sworn expert testimony to rebut the sworn deposition testimony of Dr. Callan. Our cases do not impose such a burden on a claimant in a workers' compensation case.

■ As Mr. Spencer maintains, this is not a negligence case. This is a workers' compensation claim case, filed under our Workers' Compensation Act. As we have reiterated consistently and persistently in our workers' compensation cases, the "purpose [of the Act] is to advance the humanitarian goal ... to provide compensation to employees for work-related disabilities reasonably expeditiously, even in arguable cases." *Brown, supra,* 700 A.2d at 791. To ask a claimant, who already has produced substantial medical reports from the treating physician, and other relevant documentary evidence of causally related injury arising out of and in the course of employment, to provide sworn testimony to rebut an employer's medical expert, no matter how insufficient that testimony may be with respect to the presumption of compensability, would impose too high a burden and one which is inconsistent with the purposes of the Workers' Compensation Act. We decline to do so.

In summary, on this record we hold that the Director and the ALJ applied the correct legal standard governing the presumption of compensability; and that the employee, Mr. Spencer, satisfied his initial burden regarding the presumption of compensability. We also hold that the employer, failed to present substantial evidence to rebut that presumption; and that based upon the record in this case, no additional medical evidence was necessary to refute the sworn deposition testimony of the employer's expert. The employee presented extensive medical reports from his treating physician and other documentary evidence to satisfy his burden of proof, and the opinion of the employer's expert was based upon a flawed factual assumption, that Mr. Spencer did not injure his knee because he did not complain about it initially, an assumption which was rejected by the fact finder.[6] As the Director stated:

> [Mr. Spencer] has offered substantial, credible evidence of a work related injury which necessitated time off from work, and ultimately required surgery. The fact that [Mr. Spencer] had a pre-existing arthritic condition does not change the fact that the work injury

---

the employment action." *Id.* at 507, 113 S.Ct. 2742 (citation omitted) (emphasis in original). The claim based on Title VII was not mentioned in WMATA's brief and is not properly before us. *See, e.g., In re Shearin,* 764 A.2d 774, 778 (D.C.2000). Under these circumstances, without briefing of the issue or even notice to opposing counsel, we decline to take the far reaching step of drawing the proposed analogy between our worker's compensation law, with its statutory presumption of compensability, and the federal employment discrimination statute.

5. Even assuming that WMATA had presented substantial evidence to rebut the presumption of compensability, there is no doubt that Mr. Spencer "prove[d] by a preponderance of the evidence that [his left knee] injury was caused by [his] job requirements...."

6. *Washington Hosp. Ctr. (Anderson), supra,* relied on by WMATA, is not controlling. In that case, the opinion of the employer's expert was not based upon a flawed factual assumption.

aggravated, or exacerbated his condition, thus requiring additional medical treatment, surgery, convalescence, and therapy.

> The Administrative Law Judge's finding that [Mr. Spencer's] disability arose out of and in the course of employment is supported by substantial evidence in the record considered as a whole, and is in accordance with applicable law.

In essence, the Director resolved the issue presented to him by determining that "the injury to Mr. Spencer's knees and his subsequent disability, is causally related to the injury sustained in the May 26, 2000 work related accident." In short, there is substantial evidence in the record showing that Mr. Spencer suffered a work related injury that aggravated the condition of his knees.

For the foregoing reasons, we affirm the Director's decision.

*So ordered.*