Mary VOGEL, Appellant

v.

**DISTRICT OF COLUMBIA OFFICE OF PLANNING, et al.,**
**Appellees.**

**No. 05–CV–186.**

District of Columbia Court of Appeals.

Argued May 4, 2006.
Decided March 13, 2008.

---

Barbara Kraft, Washington, DC, for appellant.

William J. Earl, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General at the time the brief was filed, and Edward E. Schwab, Deputy Attorney General at the time the brief was filed, were on the brief, for appellee District of Columbia Office of Planning.

Before FARRELL, GLICKMAN and KRAMER, Associate Judges.

GLICKMAN, Associate Judge:

Appellant Mary Vogel is a former community planner with the District of Columbia Office of Planning ("OP"). She was terminated at the end of her probationary employment period. Vogel complained to the District of Columbia Office of Human Rights ("OHR"), which found that OP had retaliated against her for activity protected by the District of Columbia Human Rights Act ("DCHRA"). OHR directed OP to reinstate Vogel with back pay. The Superior Court reversed OHR's determination, finding that Vogel was not entitled to relief because she had not engaged in protected activity. Vogel has appealed. We affirm.

## I.

Mary Vogel commenced her employment with the Office of Planning in July of

1999. Vogel, who was fifty years old and had a master's degree in urban and regional planning, was hired as a DS–11 employee, the lowest salary grade level, for a one-year probationary period. Her duties as a community planner included preparing plans, reports, and studies, and reviewing and commenting on proposed zoning revisions.

In August 1999, Andrew Altman became the Director of OP. Altman brought in Maria Wallace as Director of Operations and Ellen McCarthy as a Deputy Director. McCarthy became Vogel's supervisor. Altman also hired a number of other employees, some of them as Special Assistants to the Director, at relatively high grade levels. A majority of the new hires (though not Wallace or McCarthy [1]) were under forty years old and younger but better paid than the staff members who had been at OP before Altman arrived. The latter group of workers, including Vogel, perceived that they were being treated inequitably and disrespectfully by Altman and Wallace. In January 2000, Vogel met privately with Altman to complain about her low pay, Wallace's overbearing management style, and Altman's unavailability to meet with Vogel about her work.

Some five months later, on June 7, 2000, McCarthy recommended that Vogel be terminated. According to McCarthy, Vogel did not meet the needs of her department because her expertise was in environmental planning rather than zoning. OP accepted McCarthy's recommendation and terminated Vogel's employment at the end of the month. Vogel was offered an opportunity to continue working for OP under a consulting contract, which she declined.

Instead, Vogel complained to OHR that OP had terminated her on account of her age and in retaliation for complaining of age discrimination in her January 2000 meeting with Altman. Vogel alleged that Altman and his second-in-command Wallace "treated the older workers who were there prior to his arrival differently than ... the younger workers that he had hired." Specifically, the new Special Assistants were paid more than the "older Community Planner employees" even though they "performed essentially the same duties." In particular, Vogel stated, "[t]hese Special Assistants were paid $20,000 to $50,000 a year more than I was paid." Moreover, Vogel asserted, Altman "systematically shunned" the older employees (while being "friendly" and "more available" to the employees he had hired), and Wallace was discourteous and "tyrannical" to the older staff members, like "an army drill sergeant at boot camp," which "created an atmosphere of fear and distrust." [2]

With respect to her meeting with Altman, Vogel alleged the following:

> Because of what they felt was an obvious difference in treatment, many of the older workers believed Mr. Altman was

---

1. Wallace and McCarthy were fifty-one and forty-nine years old, respectively.

2. Vogel described Wallace's behavior toward her as follows:
 [S]he would call me on the telephone and, in an abrupt manner say, "Mary, get up here." When I arrived, she would chastise me over a trivial matter. She would give me assignments with deadlines that were almost impossible to meet and then, waste my time by calling me back to her office for something she forgot to give me.... Ms. Wallace would falsely accuse me of not telling the truth or following her orders. She would also ridicule me, sometimes in front of others.... On several occasions, Ms. Wallace insisted on editing my reports even though this was outside the scope of her duties, authority, education and background.

trying to push them out of their positions. At first, I did not believe their perceptions were correct. I believed that Mr. Altman only needed further information and he would change my co-workers' perceptions of himself and Ms. Wallace's treatment of all of us. I believed that because he was out of the office so often that he was unaware of the poor employee morale situation that Ms. Wallace was creating. I was sure that once he knew about it, he would act to change it. In January 1999 [3], I met with Mr. Altman and expressed to him my concerns about: 1) Ms. Wallace; 2) unequal pay scales for the same work; and 3) his lack of availability to discuss my cases.

Vogel believed that the reason McCarthy gave for her termination was pretextual, "because I have a broad background and experience in urban planning and community development, and I had performed my duties as a zoning planner very well.... I never received any negative comments about my work performance from Ms. McCarthy or Mr. Altman."

OHR duly undertook to investigate Vogel's complaint. It does not appear that the Office's investigators interviewed Altman, Wallace or McCarthy (though apparently they did interview other OP employees). However, OHR served interrogatories and requests for documents on OP. In its answers to that written discovery, OP disputed Vogel's claims and pointed out that it was difficult to tell if her allegation of disparate treatment of employees was based on age or date of hiring. OP explained that Altman's Special Assistants were paid more than Vogel and other community planners because they were doing "vastly different work, requiring long hours, specialized skills and experience, and other characteristics deemed essential by Mr. Altman." While OP acknowledged that Altman had a meeting with Vogel in which she "raised a number of issues," it insisted that Altman "never had a conversation with [Vogel] about salary inequities." OP stated that Vogel was terminated for the reason stated by McCarthy and "because her work was unsatisfactory" in several respects. OP denied that Vogel was terminated on account of her age or because she met with Altman to discuss "perceived inequities." [4]

Vogel was afforded the opportunity to respond in writing to OP's interrogatory answers. With respect to her January 2000 meeting with Altman, Vogel acknowledged in her initial response that she had complained only about her own salary:

I did not have a conversation with Mr. Altman about salary *inequities*, rather my own salary inequity, so perhaps *technically* the Respondent is correct here. (Although I was aware that other older employees perceived salary inequities, I was speaking with him only about myself.)

[I]t was at the end of my conversation with him over Maria Wallace's treatment of me. I said that I found it hard to maintain my enthusiasm for the job when there would be four newer people making nearly twice the salary I was making for doing the same work. His response was that "They would not be doing the same work." When I asked how their work would be different he

3. Vogel mistakenly alleged that the meeting took place in January 1999 (which would have been months before either she or Altman started working at the OP). It is undisputed that the meeting occurred in January 2000.

4. OP reported that Vogel was one of two employees who had been terminated since Altman became Director—the other being Wallace.

replied, "Their work would be at a higher level and they will have more experience with zoning than you."

I asked how experience elsewhere helped them to know the geography, politics, zoning regulations and comprehensive plan of DC. He did not respond, but continued to maintain that I was not being treated unfairly. I told him that I felt demoralized by his response and still wanted greater equity.

"To clarify the concerns I expressed to Mr. Altman," Vogel added in a supplemental response to OP's interrogatory answers, "I discussed largely my dissatisfaction with my pay level in comparison to the new people who were to be hired in Development Review [Vogel's department]."

In addition to her salary, Vogel stated in her supplemental response that she discussed two other topics with Altman: "the difficulty of meeting with him to discuss the Office's position in controversial zoning cases and Maria Wallace's abusive behavior." Regarding the former, Vogel explained that she needed to hear from Altman whether OP would support her recommendations. Altman agreed that he was difficult to catch because he was often away from the office, and he promised to institute office hours when he would be available. ("[B]ut this was not done during my tenure," Vogel commented.) As to Wallace's harsh treatment of the older employees, Vogel told Altman, "It is widely believed that you brought Ms. Wallace aboard to get rid of us." Thus, according

to Vogel, "Mr. Altman was aware that older workers believed that he was trying to push them out of their positions because I told him this was the case at my January 2000 meeting with him." However, Vogel reported, in their meeting Altman "denied that that was the case."

OHR concluded its investigation and issued a preliminary Letter of Determination on July 8, 2003. The Letter found probable cause to believe that Vogel was terminated because of her age, largely because she had performed her duties well and OP's nondiscriminatory rationale for firing her was "unworthy of credence" and pretextual.[5] OHR also cited the fact that 21 of 27 employees hired during Altman's tenure as Director were under the age of 40.

The Letter found no probable cause to believe that Vogel's termination was retaliatory, however. OHR found that Vogel met with Altman in January 2000 "to express concerns about the brash treatment from the Director of Operations, the unequal pay scales for the older versus younger workers for the same work, and the Director of OP's lack of availability to discuss [Vogel's] concerns." OHR agreed that this activity, which it characterized as a "complaint of disparate treatment based on age," was protected by the DCHRA (albeit the salary differentials were, in fact, justified,[6] and there was "no proof" that the other conduct to which Vogel objected

---

**5.** As OHR found, Vogel's work had been commended by her former supervisor and members of the community, and there was no documentary support for OP's disparagement of her qualifications and performance. OHR found it "most compelling" evidence of pretext that the agency offered Vogel work as an independent contractor "performing the same duties which it contends she performed unsatisfactorily."

**6.** Crediting one of OP's interrogatory answers, OHR found that "[m]ost of the newly-hired, predominantly younger staff were Special Assistants to the Director of the OP doing vastly different work, requiring long hours, specialized skills and experience, therefore warranting a difference in salaries."

was actually due to age discrimination [7]). Nonetheless, OHR rejected Vogel's retaliation claim because it found no causal connection between her protected activity and her discharge. There was no evidence that McCarthy, who initiated Vogel's firing in June, knew that Vogel had complained to Altman in January; and a nexus between the two events could not be inferred from their temporal proximity alone. That OP's expressed reasons for terminating Vogel were not credible did not mean they masked a retaliatory motive.

Having obtained a favorable preliminary ruling on her age discrimination claim, Vogel did not seek reconsideration of the "no probable cause" ruling on her retaliation claim. After efforts at conciliation proved unsuccessful, OHR notified Vogel that she could request an evidentiary hearing or else receive a summary determination (based on the existing record) of her complaint.[8] Vogel elected to forego an evidentiary hearing and requested a summary determination.

Accordingly, on March 25, 2004, OHR issued a final Summary Determination.

Although the record had not been expanded, and the Summary Determination incorporated without change all the findings of fact in the preliminary Letter of Determination, OHR concluded that Vogel had not established her age discrimination claim because there was no proof that age was a substantial factor in OP's decision to terminate her. Conversely, however, OHR concluded that Vogel had proved her retaliation claim. Adhering to its earlier view that Vogel engaged in protected activity by complaining to Altman in January 2000 about "disparate treatment based on age," OHR now reasoned that a causal connection between that activity and Vogel's termination had been shown after all, because McCarthy likely did know about the January meeting,[9] the termination occurred "shortly" afterward, and OHR's stated reasons for firing Vogel were "unworthy of credence" and evidently pretextual.

 OP appealed the Summary Determination to Superior Court, contending that the decision was not supported by substantial evidence in the record.[10] The

---

7. OHR stated:

Complainant [Vogel] complains primarily about the conduct of the Director of Operations [Wallace] who was approximately Complainant's age. Other than the differences in the ages between Complainant and the Director of the OP and his staff, nothing in the OHR's record suggests that Complainant's age was the basis for the uncomfortable work environment. There is no evidence in the record showing that the insults and ridicule were based on Complainant's age any more than it could have been based on Complainant's membership in the previous directorial administration.... [T]here is no evidence or suggestion of age-related comments or insults whether verbal or written. The Complainant's age appears to never have been commented on, joked about, or even questioned by her supervisors. There is no proof in the OHR's record that the Complain[an]t's treatment stemmed from her age....

8. *See* D.C. MUN. REGS. tit. 4 §§ 109, 110 (2007).

9. OHR expressed incredulity at the idea that "line management did not discuss the concerns of the staff." Noting that OP had held a general staff meeting to address the older workers' concerns about disparate treatment, OHR inferred "that management discussed these concerns amongst themselves" as well.

10. The Superior Court is the proper forum for initial review of OHR decisions. *See Simpson v. Office of Human Rights,* 597 A.2d 392, 397–99 (D.C.1991). As with agency orders under the District of Columbia Comprehensive Merit Personnel Act, judicial review is limited to the administrative record, and the court must affirm the agency action if it is supported by substantial evidence and otherwise in accordance with law. *See* Super. Ct. Civ. R. Agency Rev. 1(g).

court agreed with OP. Examining the record, the court found no evidence that Vogel complained to Altman about disparate treatment based on age. Rather, it found, Vogel's "sole complaint about Wallace concerned her management style, not any discrimination based on age"; Vogel "complained of salary inequities between workers who were hired by Altman when he began his tenure and those who were already working in the office, not between older and younger workers"; and Vogel's "complaint that Altman was unavailable to discuss her work was never framed as an issue of inequitable treatment." Therefore, the court ruled, Vogel did not engage in activity protected from retaliation by the DCHRA.[11]

## II.

The DCHRA makes it unlawful for an employer to retaliate against an employee for opposing an employment practice that is prohibited by the Act.[12] An employee may make out a *prima facie* case of retaliation by demonstrating that: (1) she engaged in a protected activity by opposing or complaining about employment practices that are unlawful under the DCHRA; (2) her employer took an adverse personal action against her; and (3) there existed a causal connection between the protected activity and the adverse personnel action.[13] Such a *prima facie* showing gives rise to a presumption that the employer's conduct was unlawful, which the employer may rebut by articulating a legitimate reason for the employment action at issue.[14] If the employer offers a legitimate reason, the presumption of illegality drops out of the case, and the employee has the burden of proving by a preponderance of the evidence that the stated reason is pretextual and that the adverse personnel action was indeed retaliatory.[15]

The controlling question in the present case is whether OHR's finding that Vogel engaged in protected activity, the first prong of a *prima facie* case of retaliation, is supported by substantial evidence in the record.[16] "Substantial" evidence, as we often have said, "means more than a mere scintilla." [17] What we have demanded is relevant and admissible "evidence that a reasonable mind would accept

---

11. As Vogel had not cross-appealed, the court did not review OHR's determination that she had not demonstrated age discrimination.

12. *See* D.C.Code §§ 2–1402.11(a), 2–1402.61(a) (2001). We have construed these statutory provisions to guarantee employees the same protection from retaliation as is provided by the so-called "opposition clause" in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3 (a) (2007). *See Carter–Obayuwana v. Howard Univ.*, 764 A.2d 779, 790 n. 20 (D.C.2001); *Howard Univ. v. Green*, 652 A.2d 41, 45 n. 4 (D.C.1994).

13. *See Carter–Obayuwana*, 764 A.2d at 790; *Green*, 652 A.2d at 45.

14. *See Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 361, 368 (D.C.1993) (citations omitted).

15. *See id.* at 361, 369; *see also Hollins v. Fed. Nat'l Mortgage Ass'n*, 760 A.2d 563, 571 (D.C. 2000).

16. *See* D.C.Code § 2–510(a)(3)(E) (2001). Although this case comes to us from Superior Court,

> our primary task is not simply to review the Superior Court's decision for error or abuse of discretion. Rather, we approach the case as if the appeal arose directly from the administrative agency.

*Kennedy v. District of Columbia*, 654 A.2d 847, 853 (D.C.1994) (citations omitted).

17. *Office of People's Counsel v. Pub. Serv. Comm'n*, 797 A.2d 719, 725–26 (D.C.2002) (internal quotation marks and citation omitted).

as adequate" [18]—a well-worn phrasing [19] that is deferential to the administrative agency's prerogatives as trier of fact but not toothless in its insistence on evidence with genuine probative force. The test is comparable to that we employ in reviewing sufficiency of the evidence to withstand a motion for judgment as a matter of law: the opponent of the motion must be given the benefit of every reasonable inference from the evidence, but not "inferences based on guess or speculation." [20]

"Not every complaint garners its author protection" from retaliation under the DCHRA (or Title VII).[21] To constitute "protected activity," the complaint must allege an employment practice that is prohibited by the DCHRA.[22] It is not enough for an employee to object to favoritism, cronyism, violation of personnel policies, or mistreatment in general, without connecting it to membership in a protected class, for such practices, however repugnant they may be, are outside the purview of the DCHRA.[23] The employee must

"alert the employer that she is lodging a complaint about allegedly [unlawful] discriminatory conduct. Employer awareness that the employee is engaged in protected activity is thus essential to making out a prima facie case for retaliation." [24]

OHR determined that Vogel engaged in protected activity by complaining to Altman in January 2000 about disparate treatment based on age. Age discrimination in employment is prohibited by the DCHRA.[25] It is undisputed that Vogel complained of disparate treatment—specifically, of favoritism to new employees hired by Altman and hostility to incumbents (including Vogel herself) hired by previous administrations. The question is whether Vogel clearly charged that this disparate treatment was a function not (merely) of an employee's tenure, sponsorship or connections, but of an employee's age. Is OHR's key finding, that Vogel made a complaint of *age* discrimination, supported by substantial evidence in the

18. *Id.* at 726.

19. *See Consol. Edison Co. v. Nat'l Labor Relations Bd.,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

20. *Brown v. Nat'l Acad. of Sciences,* 844 A.2d 1113, 1122 (D.C.2004) (quoting *Rule v. Bennett,* 219 A.2d 491, 494 (D.C.1966)).

21. *Broderick v. Donaldson,* 369 U.S.App.D.C. 374, 380, 437 F.3d 1226, 1232 (2006).

22. The employee "need only prove she had a reasonable good faith belief that the practice she opposed was unlawful under the DCHRA, not that it actually violated the Act." *Green,* 652 A.2d at 46.

23. *Id.* at 47 (holding complaint of "social cliques and favoritism stemming from personal friendships" insufficient to support retaliation claim). *See, e.g., Broderick,* 369 U.S.App. D.C. at 380, 437 F.3d at 1232 (explaining that, without more, a complaint of "embarrassing, humiliating and downright insulting"

treatment would not be protected activity); *Sitar v. Indiana Dep't of Transp.,* 344 F.3d 720, 727–28 (7th Cir.2003) (employee's complaint of being "picked on" held not to be protected activity where employee did not say that "sex discrimination was her real problem"); *Chandamuri v. Georgetown Univ.,* 274 F.Supp.2d 71, 84 (D.D.C.2003) (student's complaint that his professor treated him "unfairly" and differently from other "similarly situated" students held insufficient to put school on notice that his allegations concerned unlawful discrimination on the basis of race and national origin).

24. *Green,* 652 A.2d at 46 (footnote omitted). Accord *Carter–Obayuwana,* 764 A.2d at 791; *Broderick,* 369 U.S.App.D.C. at 380, 437 F.3d at 1232 ("While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition.").

25. *See* D.C.Code §§ 2–1401.02(2), 2–1402.11(a) (2001).

record? Like the Superior Court, we conclude not.

The record of what transpired at Vogel's meeting with Altman in January 2000 is sparse. The only descriptions are the less-than-comprehensive accounts in Vogel's complaint and her written responses to OP's interrogatory answers, which we have set forth above. OHR evidently credited Vogel's accounts, as it was entitled to do. Nonetheless, OHR did not indicate what in Vogel's accounts led it to conclude that she complained of discrimination based on age. OHR's sole pertinent factual finding, that Vogel objected to "the unequal pay scales for the older versus younger workers for the same work," is clearly erroneous. Vogel reported, "I did not have a conversation with Mr. Altman about salary *inequities,* rather my own salary inequity.... Although I was aware that other older employees perceived salary inequities, I was speaking with him only about myself.... I said that I found it hard to maintain my enthusiasm for the job when there would be four newer people making nearly twice the salary I was making for doing the same work.... I discussed largely my dissatisfaction with my pay level in comparison to the new people who were to be hired in Development Review." Vogel complained to Altman that she was being paid less than the newly hired employees for the same work, and there is no sign that she attributed the inequality to any difference in their ages.[26]

Vogel also complained to Altman about his unavailability to discuss her work and Wallace's abusive management style. There is no substantial evidence in the record that Vogel linked either problem to discrimination based on age. While she did report having told Altman that "older workers" believed he was trying to push them out, that isolated statement is ambiguous. In context, it seems to refer not to chronologically older employees, but to employees hired before Altman arrived at OP.[27] But "the onus is on the employee to clearly voice her opposition" to illegal discrimination;[28] a vague charge of discrimination will not support a subsequent retaliation claim.[29] Without more—and there is no more—we cannot regard Vogel's ambiguous statement as *substantial* evidence that she complained to Altman about age discrimination.

The DCHRA does not prohibit disparate treatment of employees based on tenure, sponsorship, connections or the like. As OHR therefore erred in finding that Vogel engaged in protected activity under the DCHRA, we affirm the order of the Superior Court reversing the Summary Determination in her favor.

---

26. Even if Vogel had complained to Altman about pay inequities in her division generally, that still would not have amounted to attributing the inequities to age differences.

27. The two categories are not identical; for one thing, as OHR found, Altman hired some "older" employees, notably including Wallace and McCarthy.

28. *Green*, 652 A.2d at 48 (citation omitted).

29. *Id.* at 49 (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir.1989)).