Brian R. PROPP, Appellant,

v.

COUNTERPART INTERNATIONAL
and Lelei LeLaulu, Appellees.

No. 07–CV–988.

District of Columbia Court of Appeals.

Argued May 21, 2009.
Decided March 8, 2012.

John P. Racin, Washington, DC, for appellant.

Tyler A. Brown, Washington, DC, and Kara M. Ariail for appellees.

Before THOMPSON, Associate Judge, RUIZ, Associate Judge, Retired,* and FARRELL, Senior Judge.

---

* Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on September 1, 2011.

1. Propp filed a motion to alter the judgment and reinstate the retaliation claim, pled pursuant to Rule 59(e) of the Superior Court

RUIZ, Associate Judge, Retired:

Brian Propp sued his former employer, Counterpart International ("Counterpart"), and its President and CEO, Lelei LeLaulu, (collectively "Counterpart") seeking damages for employment discrimination in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C.Code § 2–1402.11(a) (2001), and for actions taken in retaliation against him for raising his claim of discrimination, also in violation of the DCHRA, D.C.Code § 2–1402.61 (2001). The Superior Court of the District of Columbia granted appellees' motion for summary judgment on both claims, and Propp appeals the dismissal on summary judgment of his retaliation claim.[1] We agree that summary judgment should not have been granted on the retaliation claim.[2] There is evidence in the record that Counterpart changed the conditions for negotiating a previously promised business relationship with Propp and abandoned potential funding for Propp's initiative only after he complained of discrimination. Because this evidence, if credited by the fact-finder, would constitute retaliation forbidden by the DCHRA, we partially reverse the grant of summary judgment and remand the case for further proceedings with respect to Propp's retaliation claim.

I. Record on Summary Judgment

The following evidence was of record when the trial court granted summary judgment. On January 1, 1995, Propp was hired by Counterpart, a nonprofit interna-

---

Rules of Civil Procedure. The court denied the motion, stating, "[p]laintiff does little more than restate his original argument for the Court."

2. Propp does not appeal summary judgment on the claim of discrimination.

tional development organization, as the Regional Director for the Western Newly Independent States within the Counterpart Humanitarian Assistance Program ("CHAP") division. In January 2001, after six years as Regional Director, Propp was promoted to General Director of CHAP Worldwide.

Among his duties, Propp was responsible for obtaining funding for both new and existing programs. He was also responsible for an initiative called Counterpart Communities which was known as his "brainchild."[3] As a result of Propp's efforts, on October 1, 2001, Counterpart received $5.4 million in funding from the United States Agency for International Development ("USAID") for Counterpart Communities. In 2002, LeLaulu became Counterpart's President and CEO, and he nominated Propp for a vice-president position. The board approved, and Propp became Vice–President of CHAP and joined the Senior Management Team.

On September 23, 2004, LeLaulu recommended to the Board that Propp be terminated, citing a budget deficit in the CHAP program in Moldova, which Propp managed, and the need to restructure CHAP due to a budget reduction. The Board voted and approved of Propp's termination. In deposition testimony, however, Propp disputed that these were the reasons for his termination. Propp testified that in response to his inquiries as to why he was being terminated, LeLaulu told him, "a reduction in force affecting one person: You."

Shortly after Propp's termination had been approved, in early October 2004, Counterpart obtained a Congressional "soft earmark"[4] in the amount of $12 million for Propp's Counterpart Communities initiative. On October 12, 2004, LeLaulu and Arthur Lovelace, Counterpart's Director of Administration, met with Propp to inform him of the Board's decision to terminate his employment. They asked him to resign. When Propp refused, he was presented with four options: (1) three months severance pay in exchange for his resignation and a release of claims, (2) three months severance pay, but spread over six months, in exchange for his resignation and a release of claims,[5] (3) resignation with no severance pay, and (4) termination with no severance pay.

Propp testified in his deposition that he understood the two severance pay options were conditioned on a waiver of claims, but that the other two options (resignation or termination) were not conditioned on a waiver of claims. The record includes the documents presented to Propp at the meeting for each of the four options, and they support Propp's testimony.[6] Propp

3. Counterpart Communities, as described by Propp, was "a relationship building program using humanitarian assistance," that would offer not only humanitarian aid, but also technical assistance and economic development from the United States to other countries.

4. A "soft earmark," as described by Propp, refers to Congress's inclusion of language relating to a particular program in a report recommending funding for that program. According to Propp, "we had language that matched both the Senate and the House version in report language. And one of the requirements is they have to match word for

word, paragraph for paragraph ... we had achieved the point where both of those matched and there was a—it actually was approved by both Houses and sent to the President for signature and signed into law."

5. Presumably, this option was intended to have tax benefits for Propp.

6. Only the two severance pay agreements included a release clause. The release clause states in relevant part,

This release is intended by Mr. Propp to be all encompassing and to act as a full and total release of any claims that Mr. Propp

refused to choose among the four options; instead, Counterpart immediately terminated his employment, without severance pay, even though Propp had declined to sign a waiver releasing any claims he might have against them.

Appellees admit that notwithstanding the termination of Propp's employment, they agreed to enter into a contractual relationship with Propp.[7] Propp understood that he and LeLaulu would negotiate a consulting agreement for Propp to continue work as a consultant for approximately one year at his current salary and that the consulting agreement would include a release of claims. According to Propp's deposition, on October 12, 2004, he "made it clear to [LeLaulu] ... that there needs to be one agreement, not two separate agreements, and that the offers that were on the table would have to be revised to incorporate a consulting agreement; and that there should be one agreement that encompassed everything."

That same evening, after having met with Propp and terminating his employment, LeLaulu sent an e-mail to Counterpart staff worldwide in which he announced that "Propp will no longer be working on CHAP-related duties. Instead, [Propp] has agreed to concentrate on Counterpart Communities and other strategic opportunities for the organization. We will be strategizing with [Propp] and will, of course, inform you of developments."

Less than a week later, on October 18, 2004, Propp's attorney sent a letter to Counterpart stating, "Propp hereby opposes practices at Counterpart he reasonably believes to have been discriminatory," intimating that his termination was discriminatory, based on age and ethnicity.[8]

Propp "was holding out hope for a consulting agreement" and five months after his attorney sent the letter complaining of discriminatory termination, his attorney again contacted Counterpart in an attempt to negotiate Propp's post-termination business relationship with Counterpart. Propp testified that it came to his attention that "Counterpart at some point said that any consulting arrangement that might be entered into would be contingent upon [his] signing a release such as [he

---

may have or has had against CPI, including, but not limited to, any federal or state law or regulation dealing with either employment or employment discrimination such as those laws or regulations concerning discrimination on the basis of age, race, color, religion, creed, sex, sexual preference, national origin, disability status or status as a disabled or Vietnam Era veteran; any contract, whether oral or written, express or implied; or common law.

The other two options are in the form of a letter. In one letter, addressed to LeLaulu, Propp tenders his resignation and in the other letter, addressed to Propp, LeLaulu informs Propp of "Counterpart International's decision to eliminate [his] position and, accordingly, to terminate [his] employment effective October 12, 2004."

7. Propp's complaint, ¶ 13 alleged "Upon information and belief, LeLaulu was concerned about the negative impact of Propp's departure upon the effort to obtain federal funds for Counterpart Communities, so agreed to enter a contractual relationship calling for him to continue the effort for funding." In their Answer, appellees denied "LeLaulu was concerned about the negative impact of Propp's departure upon the effort to obtain federal funds for Counterpart Communities." However, they "admit[ted] the remaining allegations in Paragraph 13."

8. The letter reads in part, "[U]nfortunate aspects of Mr. Propp's experience at Counterpart over the past few years also lead us to believe that age and ethnicity may well be motivating factors in the decision to target him for a one-person RIF he believes to be virtually unique in the history of the organization. If so, the termination is taking place in violation of law...."

was] presented with on the day that [he] met with LeLaulu that would release all [his] rights." According to Propp, Counterpart made "no efforts to negotiate, to communicate, to try to stimulate any discussions. There was nothing." Instead, Counterpart put the original offer (the four termination options) back on the table and gave him 48 hours to decide. According to Propp, it was "[e]ither sign it or go away."

On May 23, 2005, seven months after Propp was terminated, Propp's counsel sent a letter to Counterpart outlining his attempts to negotiate Propp's continuing business relationship with Counterpart. According to counsel, at the time LeLaulu terminated Propp, "LeLaulu then indicated the organization hoped to have an ongoing relationship with him." But as counsel detailed in his letter, Counterparts' attitude changed after Propp complained of discrimination and "indicate[d] a level of hostility" against Propp:

> "We first spoke on October 27, 2004. I outlined a general approach to settlement that seemed to me in the interest of both parties, and on November 15th you called to report your client would like to know the specifics. On November 22nd I conveyed an offer. On January 21, 2005, you left a message to the effect your instructions were to say your client was not budging from its original severance proposal. Moreover, after keeping us waiting eight weeks as Mr. Propp contemplated an uncertain future, your client also ordered you to say he had a week to respond. The lack of courtesy did not augur well, but we returned to the drawing board and on

January 27th came back with a revised proposal for settlement. Your client then delayed four months before directing you to say again it was not budging—it could have ordered the same on January 28th of course—but now wanted an answer within 48 hours, a condition absurd in the circumstances, and showing more than a simple willingness to offend, at least where Brian Propp and others like him are concerned."

There is no evidence that Counterpart responded to Propp's counsel's letter.

On October 7, 2005, Propp filed the underlying lawsuit claiming discriminatory termination and retaliation.[9] After discovery, Counterpart moved for summary judgment, which the trial court granted saying that "plaintiff had not established a *prima facie* case of discrimination and the retaliation claim failed as a matter of law." On appeal, Propp argues that the trial court erred in granting summary judgment on the retaliation claim because there are material facts in dispute. We agree and reverse and remand for further proceedings.

## II. Analysis

Under the DCHRA, "it is an unlawful discriminatory practice for an employer to retaliate against a person on account of that person's opposition to any practice made unlawful by the DCHRA." *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C.1994). Where, as here, the plaintiff relies on circumstantial evidence to prove retaliation, we apply the *McDonnell Douglas*[10] burden-shifting framework. *See, e.g.,*

9. Propp, who is white, was 52 years old at the time he was terminated. The claim of discrimination was based on allegations that his duties were taken over by younger, "less expensive" employees and that LeLaulu, from New Zealand, is "non white."

10. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

*Chang v. Inst. for Public–Private P'ships, Inc.,* 846 A.2d 318, 329 (D.C.2004).

Under the *McDonnell Douglas* framework, a plaintiff bears the initial burden of producing evidence to sustain a *prima facie* case. *See McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817. If the plaintiff satisfies this burden,

> [T]he employer must then produce evidence of a legitimate, nondiscriminatory [or nonretaliatory] reason for its action. If the employer offers a legitimate, nondiscriminatory [or nonretaliatory] reason, the burden then shifts back to the plaintiff to present evidence that the employer's proffered reason is pretextual. The ultimate burden of persuasion rests with the plaintiff to show that the defendant acted with impermissible motive or intent.

*Chang,* 846 A.2d at 329 (citing *Blount v. Nat'l Ctr. for Tobacco–Free Kids,* 775 A.2d 1110, 1115 (D.C.2001)); *and see McDonnell Douglas Corp.,* 411 U.S. 792 at 802–04, 93 S.Ct. 1817.

### A. *Propp's prima facie case of retaliation*

To establish a *prima facie* case of retaliation, the plaintiff must demonstrate by a preponderance of the evidence that: (1) he was engaged in a protected activity or that he opposed practices made unlawful by the DCHRA, (2) the employer took an adverse action against him, and (3) a causal connection existed between his opposition or protected activity and the adverse action taken against him. *See Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 368 (D.C.1993).

### 1. *Did Propp engage in protected activity or oppose unlawful practices?*

Propp meets the first prong of a *prima facie* case for retaliation because his counsel's letter notified Counterpart that Propp believed his termination was unlawfully based on his age and ethnicity, in violation of the DCHRA, D.C.Code § 2–1401.01 *et seq.,* and the Age Discrimination in Employment Act, 29 U.S.C.A. § 621 *et seq.* *See Vogel v. District of Columbia Office of Planning,* 944 A.2d 456, 464 (D.C. 2008) ("The employee must alert the employer that she is lodging a complaint about allegedly [unlawful] discriminatory conduct.") (alteration in original) (internal quotation marks and citation omitted); *Paquin v. Fed. Nat'l Mortgage Ass'n,* 119 F.3d 23, 31–32 (D.C.Cir.1997) (finding that a letter from an employee to his employer asserting that his termination was unlawful is activity protected from retaliation). An employee is protected from retaliation even if the employer's conduct alleged to be discriminatory is lawful, so long as the employee reasonably believed the employer's action was discriminatory. *See Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988).

### 2. *Did Counterpart take an "adverse action" against Propp?*

Propp also meets the second prong of a *prima facie* retaliation claim, namely, that the employer took an adverse action against him. The DCHRA anti-retaliation provision makes it unlawful "to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of ... any right granted or protected under [the DCHRA]." D.C.Code § 2–1402.61 (2001). More specifically and in accordance with how the Supreme Court has construed the analogous Title VII provision, Propp must demonstrate that "a reasonable employee would have found the challenged action materially adverse which ... means it well might have dissuaded a reasonable worker from making or supporting a charge of

discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (internal quotation marks and citation omitted).[11]

Propp presented evidence of two adverse actions Counterpart took against him after he complained of discrimination. First, that Counterpart chose not to pursue the $12 million in federal funding that had been earmarked for the Counterpart Communities initiative he had created and proposed to develop under a consulting agreement. Second, that Counterpart refused even to negotiate a contractual relationship with him unless he first released Counterpart of all claims, including his complaint of discrimination, as part of his termination.[12]

With respect to the first point, there is conflicting evidence on whether Counterpart abandoned the potential funding for Propp's Counterpart Communities project. On the one hand, LeLaulu's October 12 e-mail to Counterpart staff worldwide states that Propp "will no longer be working on CHAP-related duties[ ]" but "has agreed to concentrate on Counterpart Communities...." On the other hand, Counterpart did not engage Propp to pursue the funding for Counterpart Communities after terminating him.[13] Moreover, LeLaulu testified that if he had known in September 2004 that $12 million in federal funding for Counterpart Communities was on its way, "I would not have let [Propp] go ... I would have seriously considered retaining him." Thus, although it is undisputed that LeLaulu terminated Propp on Octo-

**11.** "This court has often looked to cases construing Title VII [of the Civil Rights Act of 1964, 42 U.S.C.[A.] § 2000e *et seq.* (1988)] to aid us in construing the D.C. Human Rights Act." *Arthur Young*, 631 A.2d at 361 n. 17 (internal quotation marks and citation omitted). And because "[t]he anti-discrimination provisions of both statutes are substantially similar," *id.*, "[w]e have construed [the DCHRA coercion and retaliation] provisions to guarantee employees the same protection from retaliation as is provided by the so-called 'opposition clause' in Title VII of the Civil Rights Act of 1964, 42 U.S.C.[A.] § 2000e–3 (a) (2007)." *Vogel*, 944 A.2d at 463 n. 12. (citations omitted).

**12.** While it would appear that the two actions are related, Counterpart has not argued that it refused to negotiate a contractual relationship with Propp because it was unable to secure the $12 million in funding for Counterpart Communities, or, *vice versa*, that without Propp it had no realistic expectation of securing the funding for a project so clearly dependent on him. To the contrary, Counterpart conceded in response to a request for admissions, that "Defendants never engaged or otherwise permitted [Propp] to concentrate on Counterpart Communities and other strategic opportunities for the organization *because [Propp] refused to sign a separation agreement*

*and release.*" (Emphasis added.) In addition to Counterpart's concession, the evidence demonstrates that Counterpart was willing to negotiate a consulting agreement with Propp up to half a year after Counterpart became aware that it was unlikely to secure the $12 million in funding. As LeLaulu testified at deposition, "it became more and more evident ... that our chances of getting the earmark were diminishing" before October 18, 2004, but yet, according to Propp's deposition, Counterpart still held out the possibility of a consulting agreement five months after his termination, so long as he first released his claim against the company as part of his termination.

**13.** Propp testified:

> I was, you know, ever since October 12, I was holding out hope for a consulting agreement. And time was going by. The prospects of doing something with Counterpart Communities would diminish day by day.
> The longer they dragged their feet, you know, it's like someone suffocating and, you know, after five to eight minutes you can resuscitate them, but after eight or ten minutes it's a lost cause. Well, that is kind of the way earmarks work ... if you don't act quickly, it's going to die on the vine. You need to cultivate it.

ber 12, and did not engage him to pursue the earmarked funding, it is not clear that Counterpart voluntarily abandoned the funding for Counterpart Communities.

With respect to the second adverse action Propp claims was taken against him, refusing to negotiate and changing the terms for negotiating a consulting agreement, Counterpart does not contest that it required a release of claims as a prerequisite to negotiating a continuing business relationship. It argues in its brief, however, that the "requirement that Propp sign a release of claims prior to entering into a consulting agreement was not based on any retaliatory motive," explaining that it "simply wanted Propp to agree not to sue the organization before committing to a continuing relationship with him. This is not retaliation; it is prudence in action." Counterpart's brief also argues that the release requirement was always a prerequisite for a consulting position, even prior to Propp's complaint of discrimination. Counterpart, however, does not cite to any record evidence that supports that the release requirement had been presented as a prerequisite to negotiating (as opposed to executing) a consulting agreement at the time Propp was terminated on October 12.

According to Propp's deposition, at the time he was terminated, Counterpart was willing to negotiate a consulting agreement once Propp accepted any one of the four options offered on October 12, two of which did not contain a release requirement. The documentary evidence supports-and Counterpart does not contest-that Propp was offered two options that did not require a release at the time he was terminated. See note 6, *supra.* Indeed, LeLaulu testified at deposition that had Propp chosen to resign or be terminated with no severance pay and no release on October 12, 2004, prior to his allegation of discrimination, they would have negotiated a consulting agreement. And Counterpart conceded in an admission that it "never engaged or otherwise permitted [Propp] to concentrate on Counterpart Communities and other strategic opportunities for the organization because [he] refused to sign *a separation agreement and release relating to the termination* of his employment with Counterpart." (Emphasis added.) Thus, argues Propp, Counterpart changed its tune, to his detriment, after his counsel challenged his termination as discriminatory.

There is a difference between the parties' positions which, though close, is not semantic and has legal consequences. Propp understood that he would be required to sign a release as part of a consulting agreement, although the record is unclear as to what Propp understood would be the scope of such a release. He has not argued that requiring such a release would be unlawful. What he objects to is having been required to sign a release as part of his termination, a new condition precedent to negotiating a consulting agreement imposed after he complained of discrimination.[14] For purposes of our retaliation analysis in this case, therefore, the issue is not whether releases are generally lawful and enforceable,[15] but wheth-

---

14. According to Propp's deposition, when he was terminated he "made it clear to LeLaulu ... that there needs to be one agreement ... and that the offers that were on the table would have to be revised to incorporate a consulting agreement; and that there should be one agreement that encompassed everything."

15. Requiring a release of the right to file or participate in a discrimination case filed with the E.E.O.C. in exchange for severance pay or some other generally offered benefit has been held to be "facially retaliatory" and unenforceable. *U.S. E.E.O.C. v. Lockheed Martin Corp.,* 444 F.Supp.2d 414, 418–19 (D.Md. 2006) (citing *U.S. E.E.O.C. v. Bd. of Governors*

er the release requirement was taken in retaliation for protected activity. Moreover, one need not question whether obtaining a release was a prudent course for Counterpart under the circumstances. It is enough if retaliation was "a substantial factor," even if not the only factor. *Arthur Young*, 631 A.2d at 369. Accordingly, it is important to distinguish between requiring a release of claims as part of a negotiated consulting agreement, and imposing a release of claims related to Propp's termination as a prerequisite for negotiating the consulting agreement that was contemplated when Propp was terminated. Stated otherwise, Propp's claim is that, once he complained of discrimination, Counterpart refused to negotiate a consulting agreement as it had agreed to do when it terminated him, and effectively withdrew two of the termination options that did not include a release that had been offered before his complaint because he had complained of discrimination.

█ If proven, Counterpart's refusal to negotiate with Propp for a consulting position, as it had previously agreed to do, unless Propp signed a release as part of his termination—a requirement imposed only after he complained of discriminatory treatment—would be an adverse action within the contemplation of the DCHRA's retaliation provision. The Supreme Court has broadly defined what constitutes an "adverse action" to include (in addition to termination, denial of promotion, etc.) actions taken by employers which "a reasonable employee would have found ... materially adverse, which ... might have

dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 77–78, 126 S.Ct. 2405 (internal quotation marks and citation omitted). Therefore, simply because Counterpart may have had a business-related reason ("prudence in action") for conditioning negotiations for the consulting agreement on a release of claims, it could not require a release of claims in response to Propp's complaint of discrimination. "The statute contains no safe harbor for otherwise lawful acts done for an improper retaliatory purpose." *Arthur Young*, 631 A.2d at 367; *see also Atlantic Richfield Co. v. District of Columbia Comm'n on Human Rights*, 515 A.2d 1095, 1101 (D.C.1986) (finding a threat to an employee that "she would never work in the District of Columbia again if she pressed her discrimination claim" to be retaliatory).

That the consulting agreement was not guaranteed, and that Propp had only an expectation that he would be retained as a consultant based on LeLaulu's statement that they would negotiate a contractual relationship, does not preclude Counterpart's actions from being considered adverse. *See Lockheed Martin*, 444 F.Supp.2d at 419 ("Whether severance benefits are a right or a discretionary gift or anything in between is ... irrelevant."); *Paquin*, 119 F.3d at 32 ("An employer's withdrawal of a voluntary benefit ... may constitute adverse action.").

In announcing that the definition of an adverse action should be broad, the Supreme Court has emphasized that "the

---

*of State Colls. & Univs.*, 957 F.2d 424, 430 (7th Cir.1992)). Courts impose various degrees of scrutiny in evaluating releases of discrimination claims, from a strict "totality of the circumstances" analysis, *Bormann v. AT & T Commc'ns, Inc.*, 875 F.2d 399, 402–03 (2d Cir.1989), to application of "ordinary contract principles." *Runyan v. Nat'l Cash Reg-*

*ister Corp.*, 787 F.2d 1039, 1044 n. 10 (6th Cir.1986) (en banc). In this case, we need not decide whether a demand for a release of claims in any consulting agreement would have been retaliatory because, as discussed in the text, the evidence supports that Counterpart's request for a release was factually tied to Propp's claim of discrimination.

significance of any given act of retaliation will often depend upon the particular circumstances." *Burlington N.*, 548 U.S. at 69, 126 S.Ct. 2405. The Court cited several employer actions found to be adverse, including the rescinding of a "flex-time" schedule, *id.* (citing *Washington v. Illinois Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir.2005)), and "[a] supervisor's refusal to invite an employee to . . . a weekly training lunch that contributes significantly to the employee's professional advancement[,]" *id.* (citing 2 E.E.O.C. Manual § 8, p. 8–14 (1988)), and concluded that, "a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an 'act that would be immaterial in some situations is material in others.'" *Id.* (quoting *Washington*, 420 F.3d at 661).

In *Passer v. Am. Chem. Soc'y*, the D.C. Circuit held that an employer's cancellation of a symposium in an employee's honor after the employee filed charges of discrimination was an adverse action for purposes of Title VII. 935 F.2d 322, 331 (D.C.Cir.1991) (noting that the "cancellation of the seminar humiliated [the employee] before the assemblage of his professional associates and peers from across the nation, and made it more difficult for him to procure future employment."). In *Rochon v. Gonzales*, the D.C. Circuit again broadly construed what constitutes an adverse action, holding that the refusal of the Federal Bureau of Investigation to investigate, as it would ordinarily do for any member of the public, a death threat made against an FBI agent, after he filed a discrimination complaint against the agency was an adverse action. 438 F.3d 1211, 1220 (D.C.Cir.2006) (noting that "a reasonable FBI agent well might be dissuaded from engaging in activity protected by Title VII if he knew that doing so would leave him unprotected by the FBI in the face of threats against him or his family."). Similarly, the Tenth Circuit in *Hillig v. Rumsfeld*, held that an employer's negative job references in connection with a former employee after the employee had complained of discrimination was an adverse action and actionable as retaliation under Title VII. 381 F.3d 1028, 1035 (10th Cir.2004).

The employees in *Passer, Rochon,* and *Hillig* did not have a "right" to the so-called "benefit," whether it be, respectively, a symposium in the employee's honor, having threats investigated, or not receiving negative job references. *See* 935 F.2d at 331, 438 F.3d at 1220, 381 F.3d at 1035. Nevertheless, the employers' refusal to provide the expected "benefit" was found to be an adverse action. Here, too, although Propp did not have a "right" to a consulting agreement, he had an expectation that Counterpart would negotiate in good faith based on LeLaulu's comments to him during their meetings on October 12. Propp's expectation was reasonable, as evidenced by LeLaulu's e-mail to Counterpart staff worldwide announcing that Propp had "agreed" to work on the Counterpart Communities program as well as "other strategic opportunities" for the organization. Similarly, Propp had reasonably pursued federal funding for the Counterpart Communities initiative with which he was professionally identified and for which he had succeeded in obtaining a "soft earmark". To lose the consulting position and the opportunity to develop his initiative meant not only a financial blow, but a strike against his professional reputation and future prospects.

According to Propp, Counterpart reneged on or abandoned those expected benefits once Propp complained of discrimination. A consulting arrangement after Propp was terminated would have permitted him to further his Counterpart Communities initiative with anticipated support

from federal funding. Here, as in *Lockheed Martin*, defendants "presented [Propp] with a Hobson's Choice": he could release his claim of discrimination or forfeit the opportunity to develop his initiative through the consulting position. 444 F.Supp.2d at 419. Such a stark choice, according to the Supreme Court, would "have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68, 126 S.Ct. 2405 (internal quotation marks and citations omitted). Accordingly, Propp has met the second prong of a *prima facie* retaliation case.

3. *Was there a causal connection between the adverse action and the protected activity?*

▆▆▆ To establish the third prong of a *prima facie* case, appellant must demonstrate that the adverse action was causally connected to the protected activity. *See Arthur Young, Co.*, 631 A.2d at 368. Temporal proximity between the protected activity and the adverse action can establish the causal connection. *See Chang*, 846 A.2d at 329; *Hollins v. Fed. Nat'l Mortg. Ass'n*, 760 A.2d 563, 579 (D.C.2000) ("The causal connection . . . may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity.") (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (1985)). In this case, in addition to a close temporal link between Propp's claim of discrimination and Counterpart's refusal to negotiate, LeLaulu's deposition testimony

and Counterpart's admission, see notes 7 and 12, *supra*, support that Counterpart changed positions and made the release of claims a prerequisite to negotiating the consulting agreement *because* Propp complained of discrimination. (Emphasis added.) Thus, Propp has presented sufficient evidence to make out a *prima facie* case that defendants' stonewalling on a continuing business relationship absent a release of claims was causally connected to his discrimination complaint.

**B. *Counterpart's proffered legitimate, nondiscriminatory reason***

Once Propp has presented a *prima facie* case of retaliation, the burden shifts to Counterpart to show a legitimate, non-retaliatory reason for the contested action. *See Arthur Young*, 631 A.2d at 368. Counterpart has proffered legitimate business reasons for both adverse actions. First, Counterpart argues that it was merely being prudent when it refused to negotiate a consulting agreement with Propp while he was complaining of discrimination. Second, Counterpart contends it decided not to pursue the $12 million in federal funds because it "did not believe that Propp or Counterpart would be successful in securing funding."

1. *Refusal to negotiate*

▆▆▆ Counterpart's desire not to engage as a consultant a person who might be in litigation against the company could be considered a valid non-discriminatory business reason.[16] As discussed in the

---

16. Had Propp not complained of discrimination or had the release requirement been established prior to the discrimination claim, Counterpart would have had a freer hand (absent a contractual obligation) to require Propp to sign a release in exchange for severance pay. *See U.S. E.E.O.C. v. SunDance Rehab. Corp.*, 466 F.3d 490, 500–01 (6th Cir.

2007) (noting that under the Americans with Disabilities Act of 1990, 42 U.S.C.A. § 12101 *et seq.*, the Age Discrimination in Employment Act of 1967, 42 U.S.C.A. § 621 *et seq.*, the Equal Pay Act of 1963, 29 U.S.C.A. § 206(d), and Title VII, "simply offering [a separation agreement which includes a release of claims in exchange for severance pay]

previous section, its character changes, however, and becomes unlawful, if Counterpart refused to enter into a contract or if negotiations it otherwise had expressed an intent to pursue are conditioned on a release of claims only once a complaint of discrimination has been made. Because these actions are retaliatory in nature, they cannot be a legitimate business reason that justifies adverse action under Title VII. *See Lockheed Martin,* 444 F.Supp.2d at 420 (holding that an employer's demand that an employee withdraw an E.E.O.C. charge to receive severance benefits was retaliatory and entitled plaintiff to summary judgment on claim of retaliation).[17]

Here, Propp testified that Counterpart made the release of claims related to his termination a prerequisite only after Propp's counsel raised the issue that Propp's termination was unlawfully based on his age and ethnicity. Counterpart asserts on appeal, but without citing to support in the record, that the release of claims was a prerequisite to negotiations even before Propp's complaint of discrimination.

Indeed, Counterpart's motion for summary judgment supports Propp's under-standing that they would negotiate a consulting agreement once he accepted *any* of the separation options of which two clearly did not require a release of claims.[18] (Emphasis added.) As set out in Counterpart's statement of undisputed facts, two of the options presented to Propp (resignation or being fired without severance benefits) did not entail a release of claims. The option LeLaulu exercised *de facto* was Propp's termination without severance pay—and *without* a release of claims. (Emphasis added.) Moreover, in a response to a request for admissions Counterpart admitted that it "never engaged or otherwise permitted [Propp] to concentrate on Counterpart Communities and other strategic opportunities for the organization *because [Propp] refused to sign a separation agreement and release* relating to the termination of his employment with Counterpart." (Emphasis added.) Based on this record, a jury could reasonably conclude that Counterpart initially intended to negotiate a consulting agreement without requiring a prior release of claims related to the termination, and then changed its mind once the potential discrimination claim was raised.[19]

is not facially retaliatory"); *U.S. E.E.O.C. v. Nucletron Co.,* 563 F.Supp.2d 592, 597 (D.Md. 2008) (mere offer of benefits in exchange for general release of claims not retaliatory). *See* cases cited in note 15, *supra.*

17. The court in *Lockheed Martin* held that the letter the employer sent to the employee notifying her that she would have to withdraw her discrimination complaint to receive previously offered benefits was direct evidence of retaliation, and thus did not apply the *McDonnell Douglas* burden-shifting analysis. 444 F.Supp.2d at 420. The court went on to state that "no legitimate, nondiscriminatory reason for the adverse employment action has been or can be alleged." *Id.*

18. Counterpart's motion for summary judgment states that "Propp understood there would be no negotiating of a consulting agreement until the terms of his separation from Counterpart were finalized." Counterpart quotes from Propp's deposition, in which he stated that, "I had not agreed to sign away my rights at that point. But I had agreed to work out a consulting agreement ... And he [LeLaulu] also agreed that we would work out a consulting agreement."

19. Indeed, it could be argued Counterpart has not provided evidence for the proffered legitimate business reason and, accordingly, does not meet its burden of production under *McDonnell Douglas. See* 411 U.S. 792, 93 S.Ct. 1817. Propp, however, did not move for summary judgment on the basis that Counterpart had failed to present evidence controverting a material fact that requires jury consideration.

## 2. The funding for Counterpart Communities

Counterpart's legitimate non-retaliatory reason for not pursuing the $12 million in funding is supported by LeLaulu's pretrial deposition in which he stated that he believed that Counterpart "did not have the resources to ... [or] the capacity to ... convert the soft earmark into program cash."

### C. Pretextuality

"[C]ourts are not free to second-guess an employer's business judgment, [and] a plaintiff's mere speculations are insufficient to create a genuine issue of fact regarding an employer's articulated reasons for its decisions." *Furline v. Morrison*, 953 A.2d 344, 354 (D.C.2008) (internal quotation marks and citations omitted). But employers cannot shield their adverse actions as business judgment if the record belies the proffered reason. In light of the evidence we have outlined, a jury could find, as Propp argues, that LeLaulu's proffered non-discriminatory reasons were not the real reason (or not the only reason) for its adverse actions and that Counterpart refused to pursue a contractual business relationship with Propp and the $12 million in federal funding to punish Propp for engaging in activity protected by the DCHRA, namely, alleging that his termination was discriminatory.

On the funding issue, Propp argues that Counterpart's explanation, i.e., that it could not convert the soft earmark into program cash, was offered in the context of this litigation and is pretextual. The contemporaneous record belies Counterpart's proffered reason for not pursuing the funding, or so a jury could find. First, in early October 2004, Counterpart received positive news on the earmark funding in the relevant United States Senate and House of Representatives committee reports.[20] Second, if LeLaulu was at the time concerned that Counterpart would not be able to secure the funding for Counterpart Communities, it is difficult to understand why he would have announced to the Counterpart staff worldwide that Propp "has agreed to concentrate on Counterpart Communities and other strategic opportunities[.]" Additionally, defendants have admitted that LeLaulu "agreed to enter a contractual relationship calling him to continue the effort for funding."

As already noted, Propp may prevail by proving that Counterpart's actions were motivated in substantial part by retaliatory reasons, even if they were motivated also by legitimate business reasons. *See Furline*, 953 A.2d at 353 (adopting Title VII's mixed motive analysis). Here, "[Propp] presented sufficient evidence for a jury to find that retaliation ... actually motivated the employer's decision." *Id.* (internal quotation marks and citations omitted). As we have previously held, "[w]hether the employer had such a retaliatory motive is a question of fact for the jury (or the judge in a non-jury trial) and, like other types of

**20.** According to an email in the record, the Senate Foreign Operations Appropriations Report, S. Rept. 108, stated:

> The Committee recommends that USAID and the State Department provide up to $12,000,000 to expand Counterpart Communities programs in [the former Soviet Union, Central Asia and the Middle East] and to Asia, Africa and Latin America.

The House Foreign Operations Appropriations Report, H. Rept. 108–599, stated:

> [T]he Committee urges USAID to actively consider an innovative proposal from Counterpart Communities to strengthen existing city partnerships and potentially create new Counterpart Community partnerships.

In addition, there were plans to approach Secretary of State Powell to include $12 million for Counterpart in the President's FY 06 budget.

claims in which motive or intent is in issue, is not well suited to disposition on a motion for summary judgment." *Arthur Young,* 631 A.2d at 368. Moreover, once the plaintiff has presented a *prima facie* case, the jury may infer a retaliatory motive from its disbelief of the employer's proffered non-discriminatory reason. *See Esteños v. PAHO/WHO Fed. Credit Union,* 952 A.2d 878, 894–95 (D.C.2008) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

### III. Summary Judgment

 "This court reviews the grant of a motion for summary judgment *de novo,* applying the same standard as that utilized by the trial court." *Hollins,* 760 A.2d at 570 (citing *Colbert v. Georgetown Univ.,* 641 A.2d 469, 472 (D.C.1994) (en banc)). "A motion for summary judgment should be granted whenever the court concludes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Joeckel v. Disabled Am. Veterans,* 793 A.2d 1279, 1281 (D.C.2002) (internal citation omitted); Super. Ct. Civ. R. 56(c) (2011). In making that determination, which is one of law, we must view the evidence "in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in that party's favor." *Woodland v. Dist. Council 20,* 777 A.2d 795, 798 (D.C.2001) (internal citation omitted). We "undertake an independent review of the record" and evaluate it "in the light most favorable to the party opposing the motion . . . resolv[ing] against

the moving party any doubts about the existence of a material factual dispute." *Hollins,* 760 A.2d at 570 (quoting *Noonan v. Williams,* 686 A.2d 237, 244 (D.C.1996)).

 Here, the trial court granted Counterpart's motion for summary judgment on the basis—which we hold was erroneous—that Propp had not established a *prima facie* case. Once Propp established a *prima facie* case, Counterpart had to rebut the presumption that Counterpart's conduct amounted to unlawful retaliation by articulating and proffering evidence [21] that it had a legitimate, nondiscriminatory reason for acting as it did. Propp then bears the ultimate burden to persuade the fact-finder, by a preponderance of the evidence, that Counterpart's reason is pretextual and that Counterpart's actions were motivated, in whole or in substantial part, by a retaliatory motive. *See Knight v. Georgetown Univ.,* 725 A.2d 472, 478 (D.C.1999) (outlining the elements of the *McDonnell Douglas* procedure).[22]

Viewing the evidence "in the light most favorable to [Propp], and [drawing] all reasonable inferences . . . in [his] favor," *Woodland,* 777 A.2d at 798, a jury could find that defendants refused to negotiate a consulting agreement absent a release of claims and abandoned federal funding for Propp's Counterpart Communities initiative based, at least in part, on Propp's claim that his termination was discriminatory. This is not to say that Propp will prevail. As mentioned, Propp bears the burden of persuasion. Perhaps a jury will

---

**21.** For example, in *Chang,* the evidence constituting defendant's legitimate, non-discriminatory reason for firing plaintiff consisted of email messages reflecting that the friction between plaintiff and her co-workers had reached intolerable levels. 846 A.2d at 330. As noted, Counterpart has articulated a non-discriminatory reason ("prudence in action"),

but has presented no evidence supporting that that was its actual motivation.

**22.** The jury "need not be told about concepts that guide the judge in determining whether the case merits jury consideration." *Cabrera v. Jakabovitz,* 24 F.3d 372, 380 (2d Cir.1994).

find it hard to believe that Counterpart did not pursue $12 million in funding that was in its grasp to retaliate against Propp, or that Counterpart and Propp ever contemplated (prior to Propp's claim of discrimination) that they would embark on negotiations for a consulting agreement absent a prior release of claims. But, on this record, Propp is entitled to present his evidence to the jury and persuade the fact finder "by a preponderance of the evidence that retaliation was a substantial factor" in Counterpart's actions. *Arthur Young*, 631 A.2d at 369.

For the foregoing reasons, the grant of summary judgment is

*Reversed and remanded.*

FARRELL, Senior Judge, concurring:

I join the court's opinion because the court has no occasion to consider an available argument that, had it been made by Counterpart, would give me serious pause about reversing summary judgment on one of Propp's two claims of retaliation. As the court explains, Propp alleged that, after he complained of discrimination, Counterpart "changed its tune" by demanding a release of claims it had not earlier required as a condition of talks between the two about a possible consulting agreement. In moving for summary judgment on this point, Counterpart argued only that its conduct had not changed after receiving the letter from Propp's counsel asserting discrimination, because Propp had always known that a release of claims against the former employer was necessary before Counterpart would discuss such a contractual arrangement with him. On appeal, Counterpart continues to argue that "it is undisputed [that] Counterpart required a

release of claims as a condition of entering into a consulting agreement before Propp complained of discrimination" (Br. for Appellees at 9), an argument the court properly rejects as a basis for summary judgment.

What Counterpart does not argue, surprisingly to me, is that Propp's letter through counsel dramatically changed the parties' relationship such that, even if Counterpart hadn't earlier conditioned discussions on an up-front release of claims, it now inarguably had a valid reason to do so. For, what Propp's letter through counsel said was that (a) he believed he had been discriminated against in Counterpart's conduct leading to his firing; (b) the discrimination was unlawful under federal and local law; and (c) this matter had to be resolved satisfactorily to Propp by some further arrangement. In short, while "Propp's preference," as counsel's letter said, was "to focus on the future rather than litigate the history of the past few years," Propp was threatening legal action unless the parties came to some formal agreement[1] including, among other options, relinquishment to Propp of "any" right, title and interest in the [Counterpart Communities] program."

What else than prudent business judgment, one may fairly ask, would cause Counterpart—or any company—to refuse further talks with a former employee about a consulting relationship once he asserts, and insists on maintaining, the right to sue the company if the discussions do not end to his liking? Otherwise put, what is pretextual—a mere disguise for spite or vindictiveness—in a refusal to consider contracting with a person who will not give up the threat of suit except as part of a final "agreement"?[2] Had the

1. As Propp testified in deposition, "[T]hey [Counterpart] knew that I was seeking legal counsel and contemplating an action if we couldn't resolve it."

2. As Propp stated in deposition, he had made

issue been framed to the trial court or us in this way, I would have serious difficulty finding a triable issue of pretext in Counterpart's reaction to Propp's threat of legal action. It is not, however, our job to make a party's case for it.

it clear to Counterpart "that there needs to be one agreement ... that encompassed every- thing," including a release of claims against it.