*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

FILED 10/18/2018
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Nos. 15-CV-754, 15-CV-800 and 15-CV-801

DISTRICT OF COLUMBIA DEPARTMENT OF PUBLIC WORKS,
APPELLANT/CROSS-APPELLEE,

V.

DISTRICT OF COLUMBIA OFFICE OF HUMAN RIGHTS,
APPELLEE/CROSS APPELLANT,
and

JEFFREY DICKERSON,
APPELLEE/CROSS-APPELLANT.

Appeals from the Superior Court
of the District of Columbia
(CAP-9831-11)

(Hon. Michael L. Rankin, Trial Judge)

(Argued February 28, 2017                    Decided October 18, 2018)

*Carl J. Schifferle*, Assistant Attorney General for the District of Columbia, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General at the time the brief was filed, *Loren L. AliKhan*, Deputy Solicitor General at the time the brief was filed, were on the brief, for appellant/cross-appellee Department of Public Works (DPW). *Nadine Wilburn*, Chief Counsel, and *Andrea G. Comentale* were on the DPW brief for appellee/cross-appellant Office of Human Rights.

*Anne H. S. Fraser* for appellee/cross-appellant Dickerson.

Before, BLACKBURNE-RIGSBY, *Chief Judge*,[*] and GLICKMAN and THOMPSON, *Associate Judges*.

THOMPSON, *Associate Judge*:   In these appeals, the District of Columbia Department of Public Works ("DPW") and the District of Columbia Office of Human Rights ("OHR") have filed joint briefs challenging rulings in which the Superior Court (1) concluded that plaintiff/appellee/cross-appellant Jeffrey Dickerson was subjected to disparate treatment based on race and a racially hostile work environment while working for DPW, (2) granted Mr. Dickerson's request for back pay and benefits (including pay at the Grade 15, Step 5 level) with interest and compensation for lost overtime, and (3) awarded him attorney's fees as a sanction.   Mr. Dickerson contends in his cross-appeal that the Superior Court erred by declining to make additional awards of front pay based on the Grade 15 position and compensatory damages for emotional distress.   For the reasons that follow, we reverse as to the disparate treatment and hostile work environment judgments, affirm in part as to the attorney's-fee sanction (on the basis of the delay in effecting remedial relief as to Mr. Dickerson's successful claim of retaliation), and remand for a determination of the relevant fee amount.

---

[*] Chief Judge Blackburne-Rigsby was an Associate Judge at the time of argument.  Her status changed to Chief Judge on March 18, 2017.

## Background

This case has had a lengthy procedural history. In September 2004, OHR began investigating, pursuant to the District of Columbia Human Rights Act ("DCHRA"), a complaint of discrimination made by Mr. Dickerson, who at the time was a DPW Management and Program Analyst. In asserting his membership in a protected class, Mr. Dickerson explained that he was the only white employee among 338 DPW Parking Services Administration employees.[1] In an August 18, 2005, Letter of Determination ("LOD"), OHR addressed Mr. Dickerson's three claims: disparate treatment because of race, a racially hostile work environment, and retaliation. The LOD found probable cause as to Mr. Dickerson's hostile work environment and retaliation claims. Regarding Mr. Dickerson's disparate treatment claim, however, the LOD concluded that Mr. Dickerson had not alleged an "adverse action" such as is required for a successful disparate treatment claim. (The LOD did not reach the issue of whether a substantial factor in the

---

[1] To establish a *prima facie* case of discrimination, an employee "must demonstrate that '1) he is a member of a protected class; 2) he suffered an adverse employment action; and 3) the circumstances give rise to an inference of discrimination.'" *Little v. District of Columbia Water & Sewer Auth.*, 91 A.3d 1020, 1027 (D.C. 2014) (quoting *Kumar v. District of Columbia Water & Sewer Auth.*, 25 A.3d 9, 17 (D.C. 2011)).

complained-of actions was Mr. Dickerson's membership in a protected class.) Mr. Dickerson sought reconsideration of the no-probable-cause finding as to his disparate treatment claim, arguing that in the LOD, OHR misapplied the law by applying an overly narrow interpretation of what constitutes an "adverse action." On reconsideration, OHR adhered to its conclusions in the LOD, adding that the particular alleged conduct by DPW that Mr. Dickerson had cited as examples of adverse action — "provid[ing] . . . negative information in [Mr. Dickerson's] performance evaluation" and "conduct that had a limiting effect on [Mr. Dickerson's] employment opportunities" — was "only in retaliation for his protected activity" of filing a complaint with DPW's Equal Employment Opportunity ("EEO") Officer.

After efforts to conciliate the matter were unsuccessful, Mr. Dickerson chose to have OHR issue a "summary determination on the merits of [his] complaint based solely upon information in the complaint file." 4 DCMR § 109.1 (2006).[2] In May 2009, the administrative law judge ("ALJ") "assigned to issue [the]

---

[2] The quoted language now appears in 4 DCMR § 115.1. *See* 57 D.C. Reg. 9162, 9177 (Oct. 1, 2010). Although the regulation refers to "a summary determination *on the merits,*" 4 DCMR § 109.1 (2006) (emphasis added) (now 4 DCMR § 115.1), 4 DCMR § 115.2 (2010) provides that "[a] summary determination is a second review and consideration of the facts *to determine if the probable cause determination is appropriate*." (Emphasis added).

[s]ummary [d]etermination" reached the same conclusions as were reached in the LOD,[3] as did a "Hearing Examiner" in a December 22, 2010, "Proposed Summary Determination."[4] OHR's July 5, 2011, Final Summary Determination and Order concluded, however, that while Mr. Dickerson demonstrated that DPW lowered his (July 2, 2004) performance evaluation as retaliation for his having engaged in protected activity, he had not shown that his "lack of advancement was a result of . . . retaliatory action." OHR also concluded in the Final Summary Determination and Order that Mr. Dickerson failed to establish a *prima facie* case of a race-related hostile work environment.[5] OHR noted that a hostile work environment claim requires a "linkage between the hostile behavior and the plaintiff's membership in

---

[3] Despite the ALJ's conclusion in his order that "there was probable cause" as to Mr. Dickerson's hostile work environment and retaliation claims, the ALJ seemed to understand that he was to address the merits. He ordered the parties to "submit briefs [to him] on the issue of what award of damages [Mr. Dickerson] would be legally entitled to."

[4] Pursuant to 4 DCMR § 115.3, "[t]he Director may designate an independent reviewer to analyze the facts and make a recommendation as to whether probable cause exists to believe that discrimination has occurred."

[5] The Final Summary Determination did not address Mr. Dickerson's disparate treatment claim, as to which the LOD had found no probable cause. *See* 4 DCMR 115.2 ("A summary determination is a second review and consideration of the facts to determine if the probable cause determination is appropriate. *The summary determination does not review any of the no probable cause findings.* It may result in an affirmation or reversal of the original probable cause decision." (Emphasis added)).

a protected class" and found that Mr. Dickerson had "not demonstrated that all of the [unwelcome] behaviors [he alleged] were associated with his race." OHR also found that the comments of which Mr. Dickerson complained, if they were made, were "mere offensive utterances, little else." As relief, OHR ordered only that Mr. Dickerson's retaliatory performance evaluation be expunged from DPW and District of Columbia Department of Human Resources ("DHR") records.

On December 14, 2011, Mr. Dickerson petitioned the Superior Court for review of the Final Summary Determination and Order's no-hostile-work-environment finding and the limited remedial relief it ordered for retaliation, as well as for review of the LOD finding as to no probable cause of disparate treatment.[6]  Mr. Dickerson named OHR as the respondent. On June 22, 2012, DPW gave notice of its intent to intervene, but the Superior Court (the Honorable Michael Rankin) initially denied intervention, on the ground that DPW's notice was untimely. The court later allowed DPW to intervene as to the issue of relief.

---

[6]  Our case law establishes that "OHR's determination that there is no probable cause to believe that the Human Rights Act has been violated" — in this case, the LOD's determination as to no probable cause of disparate treatment — "is subject to judicial review." *Smith v. District of Columbia Office of Human Rights*, 77 A.3d 980, 990 (D.C. 2013) (citing *Simpson v. District of Columbia Office of Human Rights*, 597 A.2d 392, 395 (D.C. 1991)).

In a ruling issued on May 3, 2013, Judge Rankin found that Mr. Dickerson had established probable cause that he was subjected to disparate treatment on the basis of race and that he was subjected to a hostile work environment on the basis of race. Judge Rankin reasoned *inter alia* that OHR "applied the incorrect standard in analyzing probable cause, confusing probable cause with the petitioner's . . . ultimate burden of proof"; that OHR applied too-narrow an interpretation of "adverse action" for purposes of the disparate treatment claim; and that Mr. Dickerson's "sheer number of reassignments" and his treatment after he complained of suspected race discrimination sufficed to show adverse action. Judge Rankin noted that OHR had pointed to no evidence that "any other employee situated similarly to Dickerson received the kind of treatment" Mr. Dickerson received. He found that OHR's conclusions on both disparate treatment and hostile work environment went "against the great weight of the evidence" and were not supported by substantial evidence in the record, and that "the record evidence clearly establishe[d] a pattern of conduct within DPW's [Parking Services Administration ("PSA")] by Mr. Dickerson's supervisors and coworkers that can only be seen as unlawful disparate treatment based solely on race and the creation of a hostile work environment."[7] In a subsequent order, Judge Rankin remanded the matter to OHR "to determine the amount of monetary damages."

---

[7] Judge Rankin also stated that "OHR failed to consider other relief that

(continued…)

On July 5, 2013, OHR issued a Determination on Remand, finding, "[p]ursuant to the directive of the Superior Court," probable cause on the hostile work environment and disparate treatment claims and ordering the parties to submit briefs on proposed remedies. After briefing by the parties, OHR issued a Determination on Damages on August 16, 2013. OHR ordered that Mr. Dickerson be "ranked as a Grade 14, Step 8, and that [G]rade 14 step increases be awarded to him retroactively" and that Mr. Dickerson be compensated for lost overtime. OHR found that Mr. Dickerson had not demonstrated that but for discrimination, he would have been promoted to a Grade 15 managerial/deputy director position. OHR also found that Mr. Dickerson was not entitled to compensatory damages, the monetary value of leave he used because of his claimed emotional distress, or attorney's fees.

In an October 9, 2013, Determination on the Parties' Request for Reconsideration on Damages, OHR found it had miscalculated the back pay award and corrected its calculation. OHR also found that Mr. Dickerson was entitled to

_____

(…continued)

[Mr. Dickerson] may have been entitled to receive [on his retaliation claim]" beyond the remedy of expungement, but directed the parties to file briefs on proposed remedial relief only "[i]n light of the court's rulings . . . on Dickerson's hostile work environment and race-discrimination-disparate treatment claims."

an additional amount for lost overtime, additional retirement savings contributions based on the back pay award, and prejudgment interest. Additionally, OHR ordered that Mr. Dickerson be allowed to attend training of his choosing and that DPW managers be required to attend sensitivity training.

Mr. Dickerson filed a supplemental petition for review by the Superior Court, arguing that OHR's determination on damages was arbitrary and capricious, legally erroneous, and in derogation of OHR's statutory responsibility. DPW also petitioned for review, challenging OHR's determinations with respect to back pay and a retroactive promotion. After a hearing on January 31, 2014, Judge Rankin found the remedies awarded by OHR to be inadequate, reasoning that "but for" the racial discrimination, Mr. Dickerson would have received a Grade 15 position advertised in June 2004. Judge Rankin again remanded the case to OHR, this time for OHR "to provide monetary compensation for the retroactive promotion at the GS-15 level Mr. Dickerson would have received but for DPW's discriminatory conduct, beginning in June of 2004."

On remand, OHR calculated back pay from August 2005 (subsequently explaining that Judge Rankin, in remarks from the bench at the January 31, 2014, hearing, had directed the agency "to review the Grade 15 level compensation that

was in effect in August of 2005"). The parties again sought review by the Superior Court. In a June 10, 2015, "Order of Monetary Relief Including Attorney's Fees," Judge Rankin found that a remand back to OHR would be "futile" because OHR had "failed to award adequate relief — ignoring the record, applicable law, and th[e] court's findings." Judge Rankin awarded Mr. Dickerson back pay at the Grade 15, Step 5 level as from June 1, 2004 (plus associated benefits) and affirmed the OHR order of expungement of Mr. Dickerson's negative performance evaluation. Judge Rankin reasoned, however, that an award of front pay — "the difference in [Mr. Dickerson's] actual salary and a Grade 15, Step 5 salary from June 1, 2015 until October 2020, the normal date of retirement, plus a 5% pension contribution" — "[wa]s speculative in nature and exceed[ed] the scope of the court's ruling." Judge Rankin further found that the agencies had acted in "bad faith" (or, in the alternative, had violated Super. Ct. Civ. R. 11 for filing pleadings not well grounded in law and fact) and on that basis awarded Mr. Dickerson attorney's fees in the amount of $66,696.

These appeals followed.

## I. Standard of Review

"'We review a Superior Court ruling on an agency decision in the same fashion in which we would review an agency decision if it were appealable directly to us.'" *Sparrow v. District of Columbia Office of Human Rights*, 74 A.3d 698, 703 (D.C. 2013) (quoting *District of Columbia Office of Human Rights v. District of Columbia Dep't of Corr.*, 40 A.3d 917, 923 (D.C. 2012)). "We 'must affirm OHR's action if it is supported by substantial evidence and otherwise in accordance with law.'" *Id.* (internal alterations omitted) (quoting *Vogel v. District of Columbia Office of Planning*, 944 A.2d 456, 462 n.10 (D.C. 2008)). "Substantial evidence is 'relevant evidence that a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (internal alterations omitted) (quoting *Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Emp't Servs.*, 827 A.2d 35, 39 (D.C. 2003)). When this court's task is to determine whether an agency decision is supported by substantial evidence in the record, "we will disturb the administrative finding . . . only if the record compels a contrary conclusion," meaning that the administrative finding was "contrary to the overwhelming weight of the evidence in the record as a whole." *V.K. v. Child & Family Servs. Agency of the District of Columbia*, 14 A.3d 628, 633, 636 (D.C. 2011) (internal quotation marks omitted).

Mr. Dickerson urges this court to review directly "only the OHR final determinations after the first and second remand," arguing that "[r]eviewing the preliminary decisions that OHR modified on remand . . . renders the entire exercise of first-tier judicial review and remand as meaningless, undermines the agency's effort to correct its mistakes, and introduces uncertainty as to what is an appealable determination in future cases." We disagree. To take the approach Mr. Dickerson urges would be to deprive DPW of the opportunity to seek review of the Superior Court's May 3, 2013, ruling (which was a non-final and non-appealable order until followed by the Superior Court's June 10, 2015, "Order of Monetary Relief Including Attorney's Fees") and to bind OHR by rulings on remand that it was constrained to make by the Superior Court's remand orders.[8]

---

[8] This court frequently reinstates agency rulings that were superseded by rulings the agency made on remand pursuant to, and as constrained by, instructions from a reviewing tribunal. *See, e.g.*, *Payne v. District of Columbia Dep't of Emp't Servs.*, 99 A.3d 665, 671, 679 (D.C. 2014) (reinstating an ALJ's earlier compensation award granting disability benefits rather than the ALJ's Compensation Order on Remand that "accept[ed] the . . . [erroneous] framing of the issues" by the Compensation Review Board in its ruling on appeal); *Bentt v. District of Columbia Dep't of Emp't Servs.*, 979 A.2d 1226, 1233 (D.C. 2009) (reinstating ALJ's earlier compensation order rather than a subsequent order the ALJ made while "feeling his hands tied by the Board").

## II. The Disparate Treatment Claim

DPW and OHR argue that the Superior Court erred in ruling that the record that was before OHR at the time it issued the LOD compelled OHR to find probable cause of disparate treatment. They further argue that even if a probable-cause finding as to adverse action was required at that stage, the Superior Court erred by adjudicating Mr. Dickerson's probable-cause claim on the merits rather than remanding for OHR to make a merits determination in the first instance. We need not reach the second argument because we agree with the first.

It is well-established that an employee's "reassignment with significantly different responsibilities" can constitute an adverse employment action if it has "materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (internal quotation marks omitted);[9] *see also Holcomb v. Powell*,

---

[9] "When cases require interpretation of the DCHRA, this court has 'generally looked to cases from the federal courts involving claims brought under the Civil Rights Act of 1964 for guidance and ha[s] adopted those precedents when appropriate.'" *Nicola v. Washington Times Corp.*, 947 A.2d 1164, 1171 (D.C. 2008) (quoting *Benefits Commc'n Corp. v. Klieforth*, 642 A.2d 1299, 1301 (D.C. 1994)).

433 F.3d 889, 902-03 (D.C. Cir. 2006) (concluding that, even though the employee "never suffered a reduction in grade, pay, or benefits," her "extraordinary reduction in responsibilities," which were "not only far below her grade level but below the level at which she had entered federal employment *ten years earlier*," "r[o]se to the level of materially adverse consequences that inflict objectively tangible harm"); *Czekalski v. Peters*, 475 F.3d 360, 364-65 (D.C. Cir. 2007) (holding that there was an adverse employment action where plaintiff produced evidence of significantly different supervisory responsibilities:  evidence that she went from overseeing 260 federal employees, 700 contractors, 50 programs, and a $400 million budget, to overseeing fewer than 10 employees and one program with a minimal budget).

By contrast, "'purely subjective injuries,' such as dissatisfaction with a reassignment, public humiliation, or loss of reputation, are not adverse actions," *Holcomb*, 433 F.3d at 902 (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002)), and a reassignment that entails different responsibilities in the sense that it requires the employee to learn new material or to perform different daily tasks will not necessarily constitute adverse action.  In *Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742, 745, 747 (7th Cir. 2002), for example, the Seventh Circuit concluded that the complaint failed to allege an adverse action

where its gravamen was that the plaintiff, an accountant initially employed in the auditing division of the defendant Housing Authority, was transferred to the agency's investigation division, allegedly on account of his race and national origin. In so holding, the Seventh Circuit reasoned that an "auditor's job is not *objectively inferior* to an investigator's job that has identical financial terms" and that the accountant who was reassigned from investigations to audits was not "deprived of the opportunity to use the skills for which he is trained." *Id.* at 745 (emphasis added).

Similarly, in *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 273-74 (7th Cir. 1996), the Seventh Circuit held that where the plaintiff complained about his lateral transfer from the defendant's Squibb Division to the Mead Johnson division, a transfer that required him to learn new products, the transfer did not amount to a materially adverse employment action. In *Akers v. Alvey*, 180 F. Supp. 2d 894, 897-99 (W.D. Ky. 2001), *aff'd in relevant part*, 338 F.3d 491, 498 (6th Cir. 2003), the court held that there was no materially adverse action where the plaintiff, who was employed as a family support worker, alleged that she was involuntarily transferred to a different office to work as a domestic violence and child abuse investigator; plaintiff did not suffer a decrease in pay, and the court reasoned that her job responsibilities at the office to which she was transferred

were not "significantly different." In *O'Neal v. City of Chicago*, 317 F. Supp. 2d 823, 824 (N.D. Ill. 2004), an African-American police officer who was assigned to an administrative "desk job" was "involuntarily transferred back to a beat sergeant position (*i.e.*, uniformed supervisory duty 'on the streets')." The court held that there was no adverse employment action because "[t]he duties and responsibilities of a beat sergeant do not differ significantly in skill, responsibility, or compensation from those of an administrative sergeant" and because the plaintiff could not show "that a return to beat duty after four months in administrative duty w[ould] result in a deprivation of her skills." *Id.* at 828; *see also Gregory v. AK Steel Corp.*, No. 1:06-cv-41, 2007 U.S. Dist. LEXIS 47030, at *14 (S.D. Ohio 2007) (concluding that plaintiff's temporary reassignments involving a change in assigned daily tasks were *de minimis* employment actions and did not rise to the level of materially adverse employment actions).

In this case, Mr. Dickerson complained that in April 2003, his supervisor, Teri Adams, the new Administrator of the DPW PSA (who had arrived at PSA in March 2003), transferred him from working at the PSA central office on the Centralized Towing Program, to working at DPW's Blue Plains facility on the PSA

Abandoned and Junk Vehicle Program.[10]  On the record before it, OHR was not compelled to find that Mr. Dickerson's reassignment to that program was an adverse action.   Mr. Dickerson presented OHR with no evidence that the reassignment led to a decrease in his pay or benefits, elimination of supervisory responsibility, or other "objectively tangible harm."[11]  Mr. Dickerson did tell OHR that he was the only analyst employed by PSA, and he cited and furnished to OHR a consultant study that concluded that PSA was "'suffer[ing] from a serious shortage' of staff trained to perform analytical work" at its central office.  But the consultant study also stated that PSA had "only one professional analyst among its non-managerial ranks" to work on matters such as "improving business processes," and as shown on Mr. Dickerson's performance evaluation for the year ending March 31, 2003, he had had some previous responsibility for technology and

---

[10]    Mr. Dickerson complained that a lower-grade employee took over management duties relating to some Parking Services matters as to which he was the subject matter expert.  But courts should be "hesitan[t] to engage in judicial micromanagement of business practices by second-guessing employers' decisions about which of several qualified employees will work on a particular assignment." *Baloch v. Kempthorne*, 550 F.3d 1191, 1197 (D.C. Cir. 2008) (internal quotation marks omitted) (noting that an adverse employment action does not occur merely because there has been a reassignment of duties to another employee).

[11]    Although OHR reasoned at one place in the LOD that Mr. Dickerson's claim did not involve salary or benefits, OHR also recognized in the LOD that an action affecting "employment opportunities" can be cognizable as an adverse action.  Accordingly, unlike the Superior Court, we do not think the LOD applied an overly narrow interpretation of "adverse action."

program improvements for the Abandoned and Junk Vehicle Program. Thus, the record did not require OHR to conclude that Mr. Dickerson's analytic skills would go unused or atrophy in his assignment to work on the Abandoned and Junk Vehicle Program. Indeed, the LOD states that during an interview with Mr. Dickerson, "he stated [that] being assigned to Blue Plains was not a problem considering the amount of operational problems that existed at that location and the branch's need for additional staffing assistance."

Moreover, Mr. Dickerson submitted to OHR copies of emails containing weekly reports he sent to his supervisor Adams describing what appears to be analytical work on the Abandoned and Junk Vehicle Program, as well as emails from Adams describing some of Mr. Dickerson's analytical assignments relating to that program.[12] Further, Mr. Dickerson told OHR that in September 2003, after his

---

[12] For example, Mr. Dickerson reported that he "spent time researching appropriate quantities and timing for new 783 form[s] and use of current adhesive label[s] due to pending changes in legislation put forward by Council member Mendelson," legislation that Mr. Dickerson read in order "to extract operational and production material changes." An email from Ms. Adams described her assignment to Mr. Dickerson to "evaluat[e] the merits of two proposed organizational design models . . . the hybrid model and the ward-based model," an assignment the supervisor said would "challenge [Mr. Dickerson's] analytical skills" and give him an opportunity to "act upon" suggestions he had formulated about achieving "efficiency and effectiveness for PSA operations and service delivery." Adams also asked Mr. Dickerson to "recommend any opportunities for business process improvement[s] at the Blue Plains facility."

transfer to that program, he was the only representative from DPW on official business in Philadelphia "to review a private auction related to the District's temporary tag and abandoned auto problems." In the face of those descriptions and representations — which described work that seems comparable to the "process improvement[]" work described in Mr. Dickerson's performance evaluation for the year ending March 31, 2003 — OHR was not compelled to find that Mr. Dickerson was "removed from meaningful work," as he asserted, when he was reassigned by Adams; or that he had significantly different responsibilities after the reassignment; or that his assignment to work primarily on the Abandoned Auto and Junk Vehicles Program instead of the Centralized Towing Program "constitute[d] qualitatively inferior work requiring any less skill or knowledge." *Baloch*, 550 F.3d at 1197.

The information before OHR was also that while DPW's EEO Officer was conducting an investigation into Mr. Dickerson's complaints of discrimination, Mr. Dickerson was temporarily reassigned to work at the DPW Office of Information Technology Services located at DPW's 14th Street office (where, *inter alia*, Mr. Dickerson was assigned to "assess and enhance" certain business processes). Mr. Dickerson told OHR that he had "no issue" with reassignment during the investigation. Mr. Dickerson further told OHR that after he returned to work under

PSA Administrator Adams for six days in late July 2004,[13] he was assigned to work in the DPW Director's Office.  He acknowledged to OHR that his work in the Director's Office, which he did not describe in any detail, was "somewhat meaningful."

Though Mr. Dickerson did complain that his reassignment to work in the DPW Director's Office (which DPW told OHR meant an assignment to work with DPW's "top management") entailed his working under "three different supervisors," OHR was not compelled to find that the reassignment constituted adverse action.  Mr. Dickerson told OHR that his work in the DPW Director's Office beginning in August 2004 entailed work on "Special Projects."  DPW likewise explained to OHR that after Ms. Adams's arrival, Mr. Dickerson "was not assigned to a specific program but, instead, carried out various management analyses and special projects."  Especially given Mr. Dickerson's acknowledgment that his prior work at PSA, too, involved "special topical studies," we cannot say that OHR was required to find that Mr. Dickerson's reassignment to the DPW

---

[13]  Although Mr. Dickerson described confusion that surrounded this six-day reassignment, OHR could conclude from the six-day duration that it did not take DPW a "substantial amount of time . . . to correct" the problem, *Holcomb*, 433 F.3d at 903; OHR was not required to find that Mr. Dickerson was "mired in . . . professional purgatory," *id.*, for a significant period of time.

Director's Office and associated supervisor changes rendered his job responsibilities "significantly different" from what they had been before. *Douglas*, 559 F.3d at 552. And while Mr. Dickerson told OHR that his work beginning in August 2004 "b[ore] no continuity," "provide[d] little to no career enhancement and/or path," and left him "off of any career[ ]track," no evidence of career damage was before OHR;[14] there was only a bare assertion that Mr. Dickerson's having "4 different supervisors over five different periods" (between April 2004 and June 2005) would damage his career prospects.

We note that the post-LOD record (specifically, Mr. Dickerson's performance evaluation for the year beginning April 1, 2006) shows that Mr. Dickerson, in the position of Management and Program Analyst, went on to "focus[] primarily on process improvement and project implementation" at the DPW Solid Waste Management Administration ("SWMA"), where he "help[ed] reduce operator errors and . . . clarify procedures for inputting and extracting information" and worked on "implementation of a system for radio frequency identification of customers using DC municipal transfer stations," thereby

---

[14] There was, on the other hand, evidence that Mr. Dickerson had an opportunity in February 2006 for transfer to the District of Columbia Department of the Environment.

contributing to "increased efficiency of operations at the transfer stations." He also "pursued training in emergency management" and "served several times . . . at the District's emergency operations center." The documentary evidence shows that his salary went from about $68,000 while he was employed by the DPW PSA in 2003, to over $85,000 at the DPW SWMA in 2006, to almost $99,000 at SWMA in 2012. Even with the benefit of hindsight, we cannot impugn OHR's finding, in the LOD, that with respect to Mr. Dickerson's disparate treatment claim, there was no probable cause to find that he had suffered adverse action.

We conclude for the foregoing reasons that substantial evidence supported the LOD determination that Mr. Dickerson's allegations did not make out a claim of adverse action.[15] Accordingly, we affirm OHR's no-probable-cause ruling as to Mr. Dickerson's disparate treatment claim and reverse the award of back pay. For the same reason, we reject Mr. Dickerson's claim, in his cross-appeal, that OHR (and the Superior Court) erred by failing to award him front pay and compensatory damages.

---

[15] For many of the same reasons, we also see no basis for disturbing OHR's determination in the Final Summary Determination and Order that Mr. Dickerson failed to show a "lack of advancement [that] was a result of . . . retaliatory action."

### III.    The Hostile Work Environment Claim

As described above, OHR concluded in its Final Summary Determination and Order that Mr. Dickerson had not established a *prima facie* case of a race-related hostile work environment because he failed to demonstrate "that all of the [unwelcome] behaviors [he alleged] were associated with his race," and because the comments of which he complained were "mere offensive utterances, little else." DPW and OHR contend that substantial evidence supports OHR's summary determination on the merits. Mr. Dickerson urges us to uphold the Superior Court's finding that OHR failed to "connect the dots."

To prevail on a hostile work environment claim, an employee must show "(1) that [he] is a member of a protected class, (2) that [he] has been subjected to unwelcome harassment, (3) that the harassment was based on membership in the protected class, and (4) that harassment is severe and pervasive enough to affect a term, condition[,] or privilege of employment." *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 888 (D.C. 2003) (quoting *Daka, Inc. v. Breiner*, 711 A.2d 86, 92 (D.C. 1998)). "[B]ecause a hostile work environment claim is comprised of a series of separate acts that collectively constitute one unlawful employment practice, the trier of fact must focus on all the circumstances, including the

frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or [instead] a mere offensive utterance; and whether it interferes with an employee's work performance." *Id.* at 890 (internal alterations, quotation marks, and citation omitted). "[T]he acts [creating the alleged hostile environment] must be of such severity or pervasiveness as to alter the conditions of . . . employment and create an abusive working environment." *Baird v. Gotbaum*, 792 F.3d 166, 169 (D.C. Cir. 2015) (internal quotation marks omitted); the workplace must be "permeated by discriminatory intimidation, ridicule, and insult[.]" *Harris v. Forklift Sys.*, 510 U.S. 17, 18 (1993). "[T]he standard for severity and pervasiveness is . . . an *objective* one." *Baird*, 792 F.3d at 172. While generally "more than a few isolated incidents must have occurred" for there to be a hostile work environment, we have recognized that "a single insult [such as "the use of an unambiguously racial epithet such as 'nigger' by a supervisor"] may be severe enough, in and of itself, to create a hostile work environment." *Smith*, 77 A.3d at 997 (internal quotation marks omitted).

In addressing Mr. Dickerson's hostile work environment claim, OHR cited Mr. Dickerson's complaints that DPW subjected him to mandatory weekly-report requirements (which Mr. Dickerson alleged were imposed on no one else);

subjected him to "racially offensive comments and behaviors";[16] informed him (during a meeting, and in a later-rescinded letter that characterized the earlier information as "mistake[n]") that his position had been eliminated; reassigned him to another job site (the Blue Plains facility) and eventually transferred him back to work under the previous supervisor who he alleged was responsible for racially offensive comments and behaviors; excluded him "from projects in which he had expertise"; and allowed his co-workers to call him "radioactive." Having reviewed the record, we are satisfied that substantial evidence supports OHR's determination that Mr. Dickerson failed to demonstrate that he was subjected to a racially hostile work environment.

To begin with, regarding the various actions about which Mr. Dickerson complained, OHR was entitled to take into account explanations from DPW that were not facially incredible or obviously pretextual. For example, DPW explained that Ms. Adams required Mr. Dickerson but not others to file weekly reports because he performed his work duties, which DPW termed "unique" (Mr. Dickerson was the only PSA analyst), away from the PSA central office, and Adams needed to understand what he was working on. Mr. Dickerson complained

---

[16] Through such comments, Mr. Dickerson alleged, his supervisor "began to introduce 'race' into the general work dialogue."

that DPW caused employees attending a mandatory work event to sing "Lift Every Voice and Sing," a song "known as the 'Negro National Anthem.'" DPW explained that the only verse of the song sung at the PSA work event "contain[ed] a message of hope" about "a new day begun," which was a theme of the new PSA administration, not a "veiled reference to slavery."

OHR also had before it explanations from DPW regarding Mr. Dickerson's complaints that his supervisor Adams made race-based comments, including that "[w]hites are handing blacks flawed programs to run," and also stated on different occasions, "That white boy isn't going to do that to me" and "White boys are doing bad things to me." OHR was informed that the context of the "flawed program" statement was that the agency had put together a "think tank" design team to design a new parking program; that the design team had all white members, including Mr. Dickerson; and that African-American employees, including PSA Administrator Adams, who would have to implement the new program, were concerned that they "would be criticized for flaws that were inherent in the programs [they] did not help to create." (OHR understood Mr. Dickerson to say that the implication of Ms. Adams's comment was an accusation that Mr. Dickerson had racial animus, i.e., "chose to assign flawed programs to others on the basis of race."). Regarding the "white boy" comment (according to Mr.

Dickerson, a reference to a Mr. Belak, who is Caucasian), which Ms. Adams denied making, DPW explained that Ms. Adams "had raised questions and complaints about the quality of technical support provided by Mr. Belak's office to her operations staff." DPW also asserted that past behavior by those who reported the alleged comment, including Mr. Belak and a former PSA employee, "casts doubt on [their] motive and credibility."[17]

OHR reasoned in its Final Summary Determination and Order that Mr. Dickerson's complaints about comments made or repeated by his supervisor or co-workers were about "isolated comments" that, although "race-based" in some instances, were "not sufficient to establish that [Mr. Dickerson] was subjected to an abusive environment in violation of the DCHRA." OHR's reasoning about insufficient evidence of an "abusive environment" is supported in part by the undisputed fact that during much of the 2003-04 period that was the subject of his complaints, Mr. Dickerson was assigned to the Blue Plains or 14th Street locations, and thus did not have daily interaction with the accused supervisor. In other words, the record did not show that Mr. Dickerson was subjected to "a steady

---

[17] OHR was informed that a DPW investigator heard reports about other race-related comments Ms. Adams allegedly made, comments that Mr. Dickerson did not include in his complaint and of which he may not have been contemporaneously aware.

barrage of opprobrious racial comments," *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994), that permeated his work environment.

Further, DPW's explanations about the context of the statements Ms. Adams acknowledged having made (or having repeated) were a substantial basis upon which DPW could determine that the comments did not reveal or stem from racial animus or race-based hostility toward Mr. Dickerson. For example, DPW explained that the comment "[w]e ain't on no plantation no more," one of the comments about which Mr. Dickerson complained and which Ms. Adams recalled was made by a union supervisor, referred to a perception that, under a previous (African-American) administrator, employees had not been treated with respect and had not been expected to take responsibility for the quality of work done by the PSA, circumstances that the new administration sought to change. DPW explained that Ms. Adams's comment that Mr. Dickerson needed "to take a cultural awareness class because he [did not] know how to talk to blacks" followed complaints that Mr. Dickerson had treated white customers at the District's vehicle impoundment facility better than he treated African-American customers.[18]

---

[18] In response to a request by OHR for "[r]ecords of complaints by DPW staff that [Mr. Dickerson] had made racist comments about African American colleagues or treated customers at the impoundment site disparately based on their

(continued…)

Importantly, the various race-related comments about which Mr. Dickerson complained were not unambiguously racial epithets or slurs. We do not doubt Mr. Dickerson's claim that the race-related comments were offensive to him (and we likewise find them offensive). But though the comments were perhaps insensitive and the supervisor would have done better not to make or relay them, we cannot say on the record that OHR was compelled to find that they amounted to severe and pervasive race-based harassment.

The record regarding Mr. Dickerson's other complaints — about his transfer to Blue Plains, the "mistaken" announcement about elimination of his job, his exclusion from projects about which he had expertise, colleagues regarding him as "radioactive," his transfer back to the PSA central office for an unwelcoming (six-day) period of supervision under Adams — also did not compel OHR to find a race-based hostile work environment. Nothing about Mr. Dickerson's initial transfer to Blue Plains compelled a finding that the transfer was race-based. Mr. Dickerson was not the only employee detailed to Blue Plains under the new administrator, and, as DPW pointed out to OHR, the pre-EEO-complaint

---

(…continued)

race," DPW sent a letter stating that one African-American male employee "asserted that he was called 'boy' by [Mr. Dickerson]."

relationship between Ms. Adams and Mr. Dickerson seemed cordial, collegial, and encouraging: Adams thanked Dickerson for "all that [he did] to facilitate PSA [t]eamwork," praised his "great work," called him "Mr. Efficiency," and invited him to lunch. As to the later actions of which Mr. Dickerson complained, OHR had reasonably found in its LOD Reconsideration Decision that, rather than being race-based, the conduct was the result of (was "only in retaliation for") Mr. Dickerson's "protected activity" of "fil[ing] a complaint with [DPW's] EEO Officer."

For the foregoing reasons, we uphold OHR's summary determination rejecting Mr. Dickerson's hostile work environment claim and reverse the Superior Court's contrary judgment. We also reject Mr. Dickerson's claim on cross-appeal that OHR (and the Superior Court) erred by failing to order restoration of the leave he "was required to take for his emotional distress" on account of the alleged hostile work environment.[19]

---

[19] We also reject any claim that the court had the authority to award Mr. Dickerson compensatory damages for retaliation. *See Kennedy v. District of Columbia*, 654 A.2d 847, 864 (D.C. 1994) (concluding that there is a lack of "requisite statutory authorization" to award compensatory damages for employment discrimination by the District of Columbia). Mr. Dickerson acknowledges that his claim for compensatory damages is intended to seek a modification of the ruling in *Kennedy*, a modification this Division of the court is not authorized to make. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

## IV.    Attorney's Fees

In ordering DPW [and OHR] to pay Mr. Dickerson's attorney's fees, Judge Rankin cited the fact that the Final Summary Determination and Order "makes no explanation why it reversed the LOD and the Proposed Summary Determination";[20] OHR's having ignored the court's order to calculate back pay at the Grade 15, Step 5 level "beginning in June of 2004"; the "failure to effectuate . . . expungement of [Mr. Dickerson's] negative performance review," which "came to light only through counsel for Mr. Dickerson and her diligent efforts on his behalf"; DPW's "repeated [and "well out of time"] motions to intervene," "completely unfounded" motion to dismiss Mr. Dickerson's appeal, and appeal of a non-final, non-appealable order; and "counsel's contradictory misrepresentations concerning the existence, or non-existence, of the witness statements and investigatory notes" in DPW or OHR files.  Judge Rankin premised the award of attorney's fees on both the bad faith exception to the so-called American rule on attorney's fees and the "court's inherent power to 'vindicate judicial authority'" (quoting *Jung v. Jung*, 844 A.2d 1099, 1107 (D.C. 2014))

---

[20]    Judge Rankin suggested that the only reason was the "change in OHR leadership."

(internal alterations omitted), and, as an alternative, on Super. Ct. Civ. R. 11. OHR and DPW argue that the Superior Court erred in awarding Mr. Dickerson attorney's fees because DPW and OHR did not "engage[] in bad faith conduct warranting a fee award" and because the fee award was not authorized as a Rule 11 sanction.

For a variety of reasons, the fee award cannot stand undisturbed. The first is that, under our ruling today, Mr. Dickerson is the "prevailing party" only as to his efforts to obtain expungement of the negative performance evaluation as a remedy for retaliation.[21] The second is that, in making the fee award as a Rule 11 sanction, the trial court did not adhere to the requirements of Rule 11.[22] Third, with regard

---

[21] *Jung*, 844 A.2d at 1107 ("The bad faith exception to the American rule allows a court to award attorneys' fees to the prevailing party if the defeated opponent acted in bad faith.").

[22] Super. Ct. Civ. R. 11 (c)(1)(B) (2016) provides that a court may on its own initiative "enter an order describing the specific conduct that appears to violate [Rule 11]," but requires that the order "direct[] an attorney, law firm, or party to show cause why it has not violated [the Rule]" before imposing a sanction under the Rule. *See Sanders v. Molla*, 985 A.2d 439, 443 (D.C. 2009) (explaining that the trial court "may not sua sponte impose a monetary sanction without first issuing . . . a show-cause order"). Here, it is undisputed that the court did not ask OHR or DPW to show cause before imposing the sanction. Further, Super. Ct. Civ. R. 11 (c)(1)(A) provides that, pursuant to a party's motion for sanctions, the trial court may award to the party prevailing on the motion its "reasonable expenses and attorney's fees incurred" in connection with the motion. (Rule 11 was "amended [in June 2017] consistent with the 2007 stylistic changes to Federal

(continued…)

to the court's invocation of its inherent authority to impose a sanction to vindicate its authority, we are not persuaded that most of the conduct the court cited entailed an affront to the court's authority, evidenced abuse of the litigation process, or otherwise showed bad faith.

Judge Rankin's oral and written rulings arguably set June 2004 ("the date that the [Grade 15] job was advertised") as the earliest date for back pay calculations at the GS-15 level. But at the January 31, 2014, hearing, Mr. Dickerson's counsel confirmed that she had stipulated that "August 2005" was the "point at which there should have been a promotion." Accordingly, we are not persuaded that OHR deliberately defied the court's order when it calculated the back pay the court had mandated based on the August 2005 date.[23]

---

(…continued)
Rule of Civil Procedure 11"; the amended rule reflects that same principles as the 2016 rule in effect at the time of the Superior Court's decision). Here, the court made the fee award as a Rule 11 sanction on its own initiative. Thus, the court erred as a matter of law in awarding attorney's fees as a sanction under Rule 11 (even assuming that the stated grounds for the sanction amounted to violations of Rule 11 (b) — a matter we need not decide).

[23] We note that the court had already imposed the sanction of drawing "adverse factual inferences" against DPW for what the court found were DPW's and OHR's failure to produce "witness statements and investigation records and notes."

Further, the court was correct to observe that DPW filed a premature appeal from Judge Rankin's January 31, 2014, oral ruling and February 11, 2014, written order that remanded the case to OHR to award monetary compensation to Mr. Dickerson for a retroactive promotion at the GS-15 level. However, although this court dismissed the appeal as taken from a non-final order, the remand was at least arguably appealable since (it appeared at the time) all that remained was for OHR to perform a ministerial calculation.[24] As to OHR's motion to dismiss Mr. Dickerson's petition for review by the Superior Court as untimely, the record shows that the agency later withdrew its motion after discovering that the Final Summary Determination and Order had not been served on Mr. Dickerson until sometime after July 5, 2011. "[A] party is not to be penalized for maintaining an aggressive litigation posture." *Id.* (internal quotation marks omitted).

Judge Rankin criticized the Final Summary Determination and Order for "mak[ing] no explanation why it reversed the LOD and the Proposed Summary

---

[24] *See Warner v. District of Columbia Dep't of Emp't Servs.*, 587 A.2d 1091, 1093 (D.C. 1991) ("Several exceptions to the finality requirement have been recognized. [I]f nothing more than a ministerial act remains to be done [on remand to the agency], . . . the [order] is regarded as concluding the case and is immediately reviewable." (internal quotation marks omitted)). We have stressed that "[t]he court must scrupulously avoid penalizing a party for a legitimate exercise of the right of access to the courts." *In re Jumper*, 909 A.2d 173, 176 (D.C. 2006) (internal quotation marks omitted).

Determination." This court, however, has noted, without criticism, the fact that OHR sometimes, without expanding the record, makes a summary determination that incorporates the findings of fact set out in a LOD but concludes, contrary to the LOD, that a complainant has failed to establish discrimination. *See Vogel*, 944 A.2d at 462. A factor that contributes to possible different outcomes is that, at the probable-cause stage, OHR looks to whether a complainant has "met the *prima facie* elements of h[is] claim," while at the merits stage, "the higher standard of proof by a preponderance of the evidence" applies. *Smith*, 77 A.3d at 997-98.

All that said, this court has "recognized a trial court's inherent authority to award sanctions, including counsel fees, 'in appropriate circumstances for intentional abuse of the litigation process'" if a party "'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Williams v. Richey*, 948 A.2d 564, 570 (D.C. 2008) (quoting *In re Jumper*, 909 A.2d at 176 (noting that this authority is "[a]part from the authority granted pursuant to Rule 11")). "Since the assessment of sanctions is a matter committed to the discretion of the trial court, we review to determine the existence of an informed exercise of discretion and for an abuse of it." *In re Jumper*, 909 A.2d at 175. The awarding of attorney's fees pursuant to the court's inherent authority is proper "'when dominating reasons of fairness so demand.'" *Id.* at 177 (quoting *In re Estate of Delaney*, 819 A.2d 968,

998 (D.C. 2003)). Attorney's fees should be "limited to those expenses reasonably incurred to meet the other party's . . . bad faith procedural moves." *Synanon Found., Inc. v. Bernstein*, 517 A.2d 28, 38-39 (D.C. 1986).

OHR, in its July 2011 Final Summary Determination and Order in which it upheld Mr. Dickerson's claim of retaliation, ordered DPW and the DHR to expunge Mr. Dickerson's negative performance evaluation, which OHR had found was the result of retaliation. Although DPW argues that it "reasonably sought to comply with, and enforce, the expungement order," we are satisfied that Judge Rankin did not abuse his discretion in finding that DPW acted at least wantonly[25] in failing to take adequate steps to ensure that the District's personnel agency had expunged Mr. Dickerson's negative performance evaluation. An Assistant Attorney General representing DPW asked DHR to search Mr. Dickerson's records, remove the negative performance evaluation, and send the expunged material to her. The DHR General Counsel responded that the document had been expunged, but we see no evidence that he complied with the request that the document be sent to DPW counsel, or that DPW followed up on its counsel's

---

[25] *See* BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "wanton" as "[u]nreasonably . . . risking harm while being utterly indifferent to the consequences").

request. When Mr. Dickerson reviewed his employment file at DHR in May 6, 2014 — almost three years after the OHR order, and after Judge Rankin had underscored that expungement was the very least that was required after Mr. Dickerson's several years of seeking relief — Mr. Dickerson found the negative review still in his record. We conclude that Judge Rankin acted within his discretion in ordering that the District pay Mr. Dickerson's attorney's fees related to counsel's efforts to have the negative performance evaluation expunged. As the record does not disclose how much of the $66,696 attorney's fee award related to that work, we are constrained to remand the case to the Superior Court for the fee award amount to be redetermined.

\*\*

In summary, for the foregoing reasons, we reverse the order of the Superior Court finding that appellee/cross-appellant Mr. Dickerson was entitled to remedial relief on his claims of disparate treatment and hostile work environment. We also reverse the court's judgment awarding Super. Ct. Civ. R. 11 sanctions. We affirm the Superior Court's ruling requiring DPW to pay Mr. Dickerson's attorney's fees as a sanction for its failure to ensure timely expungement of the July 2004 negative performance evaluation, but only insofar as the award reflects attorney's fees

incurred in connection with obtaining that remedy.  We remand for the Superior

Court to determine the amount of that sanction.  It is

*So ordered.*